STATE OF NORTH CAROLINA v. KENNETH A. BALDWIN

No. COA99-1283

(Filed 29 December 2000)

**1. Appeal and Error— no objection at trial—insufficient assignment of error**

The Court of Appeals was not able to consider whether the trial court impermissibly expressed an opinion during a rape and kidnapping trial where defendant did not object at trial and failed to preserve the issue in any manner in the record. When a trial court acts contrary to a statutory mandate to the prejudice of a defendant, the right to appeal is preserved notwithstanding defendant's failure to object, but defendant's assignments of error must be sufficient to direct the attention of the appellate court to the particular error, with clear and specific record or transcript references.

**2. Kidnapping— second-degree—purpose of terrorizing victim—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss for insufficient evidence a charge of second-degree kidnapping for the purpose of terrorizing the victim where defendant, the victim's estranged husband, brandished a gun and confined the victim in her apartment against her will for almost twenty hours; the victim did not have an opportunity to leave the apartment without going past defendant, who held a loaded weapon; despite the victim's repeated requests, defendant did not permit her to leave the apartment at any time; defendant repeatedly threatened to kill himself, pointing the gun at his head and saying that he wanted to kill himself in front of the victim; and the victim testified that she was petrified.

**3. Kidnapping— second-degree—instruction on false imprisonment not required**

The trial court did not err in a second-degree kidnapping prosecution by denying defendant's request for a jury instruction on the lesser-included offense of false imprisonment where there was no evidence from which a rational jury could have reasonably found that defendant confined, restrained, or removed the victim for some purpose other than terrorizing her. The evidence pointed to one purpose behind the kidnapping: terrorizing the victim (defendant's estranged wife) by forcing her to watch him either kill himself or, at the least, threaten to kill himself while pointing a gun to his head. Although defendant contends that his purpose was to commit suicide, neither the victim's presence nor his presence in her home was required.

**4. Jury— deadlocked—refusal to grant mistrial**

Based upon the totality of the circumstances, the trial court did not abuse its discretion by refusing to grant a mistrial after the jury indicated its inability to reach a unanimous verdict where the jury began deliberations at 2:00 p.m. on a Friday afternoon; resumed deliberations at 3:55 after a break; sent a note to the court at 4:05 indicating an impasse; the court returned the jury to the jury room at 4:06 for further deliberations; a dinner break was taken and the jury resumed deliberations at 6:35; the jury returned to the courtroom at 8:40 to indicate that they could not reach an unanimous decision; the judge gave the jury a fifteen-minute recess and an additional instruction; the jury resumed deliberations and returned at 9:55 to indicate an impasse; after a discussion, the judge concluded that the jury was making progress, the foreperson agreed, and the jury retired at 10:00; and the jury returned at 11:04 p.m. with unanimous verdicts. The fact that the jury was required to deliberate late on a Friday night was not dispositive; the court never expressed irritation or intimated that the jury would be held for an unreasonable period.

Appeal by defendant from judgment entered 25 June 1999 by Judge Thomas D. Haigwood in Superior Court, New Hanover County. Heard in the Court of Appeals 20 September 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General Daniel D. Addison for the State.*

*Neil D. Weber, for the defendant-appellant.*

STATE v. BALDWIN

[141 N.C. App. 596 (2000)]

WYNN, Judge.

This appeal stems from the defendant's conviction for second-degree kidnaping as a result of events that occurred on 29 and 30 December 1997, but relevant evidence was presented regarding events that occurred within several years prior and several months subsequent to that time. In September 1997, the defendant and Cheryl Lang had been married for approximately seventeen and a half years, during which time the defendant had allegedly abused her both physically and verbally on numerous occasions, beginning shortly after their marriage. The defendant and Ms. Lang had two children during their marriage, a son and a daughter. The alleged incidents of abuse by the defendant became more frequent around 1991 or 1992, and often involved the defendant pulling Ms. Lang's hair, and pushing, pulling, hitting or kicking her. The defendant allegedly would throw items across the room in fits of anger, and was alleged to have physically abused the children on occasion.

On 14 September 1997, the defendant and Ms. Lang, together with their children, were living in Brooklyn, New York, having recently moved there from Germany. The defendant, who was a master sergeant in the Army at the time, was assigned to John F. Kennedy Airport. The defendant and Ms. Lang had taken their children to Manhattan for the day to sightsee. That evening, after the kids had gone to bed, the defendant and Ms. Lang were watching television when they began to argue. The defendant, who had been drinking, allegedly pushed Ms. Lang and then dragged her into the kitchen to force her to make a phone call to her mother. When she refused, the defendant went to bed, leaving Ms. Lang in the kitchen and telling her not to move. Ms. Lang gathered some of her belongings, collected the children, and decided to leave. As they were preparing to leave, the defendant woke up and became angry. The defendant grabbed Ms. Lang's throat and threatened her and the children that if they left they could never come back. Ms. Lang left nonetheless, taking the children with her. After staying overnight in Wilmington, Delaware with Ms. Lang's aunt, they continued the following day to Wilmington, North Carolina to stay with Ms. Lang's parents. Although the defendant and Ms. Lang corresponded occasionally by telephone and letters, according to Ms. Lang's testimony they did not see one another again until December 1997.

At that time, Ms. Lang and the children were living in an apartment in Wilmington, North Carolina and Ms. Lang was working at Chloride Power and Electronics. On 24 December 1997 the defendant,

who was from Wilmington and had family in the area, arrived in Wilmington for the Christmas holidays. The defendant was staying with his sister and her husband while in Wilmington. The defendant called Ms. Lang at her apartment at 10:00 p.m. on Christmas Eve and asked to see her. She responded that it was too late. On Christmas Day, Ms. Lang and the children spent several hours with the defendant and his family at the defendant's sister's house. Ms. Lang testified that during this gathering, upon prompting by the defendant, she told the defendant that the chances of their getting back together were not good. Over the next several days, the defendant visited Ms. Lang's apartment off and on to visit her and the children.

On 29 December 1997, Ms. Lang returned home from working all day. The defendant was at her apartment and had cooked dinner with the children, and they all sat down for dinner. After dinner, the children went to watch television and the defendant and Ms. Lang cleaned up, after which they went to her bedroom to talk in private. At that point Ms. Lang told the defendant that there was no chance of their reconciling and that the relationship was over. The defendant then made her walk out and tell the children that she was leaving the defendant and that they were getting a divorce, after which the defendant left the apartment, only to return a short time later.

When he returned to Ms. Lang's apartment approximately thirty minutes later, the defendant told Ms. Lang that there was something he needed to tell her before he left, and he again directed her back to the bedroom away from the children. After closing the bedroom door, the defendant pulled out a gun that he had retrieved from his sister's house while he was gone. The defendant pointed the gun in the air and waved it around, then chambered a round and pointed the gun at his own head, threatening to kill himself and stating that he had nothing to live for. Ms. Lang screamed and begged him not to kill himself and the defendant told her to keep quiet. He threw several hundred dollars at Ms. Lang and took off his wedding ring, giving it to Ms. Lang and telling her to give it to their daughter. The defendant told Ms. Lang that his insurance papers were in his foot locker and told her its combination.

Over the next several hours, Ms. Lang begged the defendant not to kill himself and to put the gun down. He would alternately hold the gun to his head, and then lower it. At breaks in the conversation, the defendant would remove the clip from the gun, but then reinsert it. Ms. Lang testified that she was petrified and was worried that the gun may fire accidentally. Ms. Lang asked the defendant why he was going

to kill himself in her apartment, and he responded that he wanted to do it in front of her. Ms. Lang asked if she could take the children elsewhere, but the defendant refused to allow her or the children to leave. He later told Ms. Lang that the children could leave, but Ms. Lang did not want the children to wander the busy street outside alone, so they stayed.

Ms. Lang continued begging the defendant not to kill himself, and he repeatedly asked her questions about what had gone wrong with their marriage and why she did not love him anymore. At one point, the defendant, who is diabetic, left the apartment to retrieve his glucometer from his car, taking the phone receiver with him. He instructed Ms. Lang not to move, and returned approximately a minute later with his glucometer. After testing his blood-sugar level with the glucometer and taking a shot, the defendant again threatened to kill himself, telling Ms. Lang to call an ambulance, which she refused to do.

This pattern continued into the morning of 30 December 1997, with the defendant threatening to kill himself and asking Ms. Lang what had gone wrong and Ms. Lang begging him not to kill himself and to allow her to leave. At one point during this period, Ms. Lang fell asleep for a short time, and awoke on the bed next to the defendant, who was awake with the gun next to him. The defendant did not allow her to leave the bedroom that night. At another point during the evening, the defendant and Ms. Lang had sexual intercourse, which Ms. Lang alleged to be non-consensual. In the morning of 30 December, the defendant again checked his blood-sugar level and took an insulin shot. Ms. Lang then accompanied the defendant to the kitchen where he got a soda, after which they returned to the bedroom. The defendant, threatening to shoot himself imminently, allowed Ms. Lang to leave the room to be with the children to comfort them when they heard the shot. Not wanting to wake the children, Ms. Lang instead sat in the hallway outside the bedroom with her hands over her ears. Shortly thereafter the defendant came and took her back into the bedroom, threatened again to kill himself, and again refused to allow Ms. Lang or the children to leave the apartment. The defendant briefly allowed Ms. Lang to leave the bedroom to go check on her son, whose bedroom door had opened, but he came and retrieved her again shortly thereafter.

After some convincing, the defendant allowed Ms. Lang to call her employer so she would not lose her job, but stood close by during the call and told her to be careful what she said. Ms. Lang simply

STATE v. BALDWIN

[141 N.C. App. 596 (2000)]

told her superiors that she was sick and hung up. Later that morning, a cable repairman stopped by in response to a repair call Ms. Lang had placed several days earlier. Ms. Lang left the bedroom to tell the repairman what was wrong, and the defendant stayed immediately behind her the entire time the repairman was in the apartment. After the repairman had left, Ms. Lang convinced the defendant to eat something to keep his blood sugar up and made a sandwich for him.

Eventually the defendant said something about needing help, and Ms. Lang agreed. Around 4:00 p.m. on 30 December 1997, Ms. Lang drove the defendant to the base hospital at Camp Lejeune. Before leaving for the hospital, the defendant gave to Ms. Lang the clip of bullets from the gun, which she hid in the apartment. She showered quickly, while the defendant talked to the children and told them what he was doing. After checking the defendant into the psychiatric ward at Camp Lejeune, Ms. Lang returned to Wilmington to her parents' house, where she broke down and told her parents of the overnight ordeal.

In February 1998, after talking with an attorney, Randall Rusch, Ms. Lang took out a restraining order against the defendant. She also filed a civil suit including claims for divorce, alimony, equitable distribution and child custody. Also in February 1998, Ms. Lang spoke to a domestic violence investigator with the Wilmington Police Department, Detective Malcolm Phelps. On 29 May 1998, at the urging of Mr. Rusch, Ms. Lang again spoke to Detective Phelps in detail regarding the events of 29 and 30 December 1997, and explained that she had been unable to serve the defendant with the restraining order. After giving a detailed statement to Detective Phelps and expressing her desire to press charges, warrants were issued charging the defendant with first-degree rape and first-degree kidnaping.

On 5 October 1998, the defendant was indicted for first-degree rape and first-degree kidnaping. Following a jury trial, the defendant was convicted of second-degree kidnaping and acquitted of the rape charge, and judgment was entered accordingly on 25 June 1999. The defendant appeals.

[1] On appeal, the defendant asserts four assignments of error. First, the defendant contends that the trial court committed plain error by impermissibly expressing an opinion during the trial. The defendant argues that, during the trial, the courtroom bailiff had been sitting or standing in front of the clerk's desk to the left of the judge. After the

defendant took the witness stand but before he began testifying, the court allegedly instructed the bailiff to sit between the jury and the witness stand to the right of the judge. The defendant argues that this conduct constituted an impermissible expression of opinion by the trial court which prejudiced the defendant and warrants a new trial. We disagree.

N.C. Gen. Stat. § 15A-1222 provides that "[t]he judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1222 (1988). Trial judges therefore have a duty of absolute impartiality, *State v. Fleming*, 350 N.C. 109, 125-26, 512 S.E.2d 720, 732, *cert. denied,* —— U.S. ——, 145 L. Ed. 2d 274 (1999), and must avoid even the "slightest intimation of an opinion," as "every defendant in a criminal case is entitled to a trial before an impartial judge and an unbiased jury." *State v. Sidbury*, 64 N.C. App. 177, 178-79, 306 S.E.2d 844, 845 (1983) (citation omitted).

Nonetheless, not every expression of opinion by the trial court constitutes prejudicial error. *State v. Blackstock*, 314 N.C. 232, 236, 333 S.E.2d 245, 248 (1985). "Whether the judge's comments, questions or actions constitute reversible error is a question to be considered *in light of the factors and circumstances disclosed by the record, the burden of showing prejudice being upon the defendant.*" *Id.* (emphasis added) (citations omitted). In a criminal case, reversible error results where the jury may rationally infer from the trial judge's action an expression of opinion as to the defendant's guilt or the credibility of a witness. *Id.*

Generally, however, a "defendant's failure to object to alleged errors by the trial court operates to preclude raising the error on appeal." *State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985); *see* N.C.R. App. P. 10(a) (2000). The defendant correctly points out that "when a trial court acts contrary to a statutory mandate and a defendant is prejudiced thereby, the right to appeal the court's action is preserved, notwithstanding defendant's failure to object at trial." *Ashe*, 314 N.C. at 39, 331 S.E.2d at 659. Nonetheless, for a defendant's assignments of error on appeal to be sufficient they must "direct 'the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references.' " *State v. Nobles*, 350 N.C. 483, 505, 515 S.E.2d 885, 899 (1999) (quoting N.C.R. App. P. 10(c)(1) (2000)). As the defendant failed to object to the trial judge's conduct at trial, and failed to preserve the issue in any manner whatsoever in the record, the defend-

ant has failed to properly preserve the question and we are unable to properly consider this issue on appeal. *See Blackstock*, 314 N.C. at 236, 333 S.E.2d at 248.

**[2]** In his second assignment of error, the defendant contends that the trial court erred in denying his motion to dismiss all charges at the close of the State's evidence on grounds of insufficient evidence to sustain a conviction. The defendant argues that the State failed to prove the specific intent necessary to support a conviction for second-degree kidnaping, specifically that the defendant unlawfully confined, restrained or removed Ms. Lang for the purpose of terrorizing her. We disagree.

"Since kidnapping is a specific intent crime, the State must prove that the defendant unlawfully confined, restrained, or removed the person for one of the eight purposes set out in the statute." *State v. Moore*, 315 N.C. 738, 743, 340 S.E.2d 401, 404 (1986); *see* N.C. Gen. Stat. § 14-39 (Supp. 1996). Furthermore, the indictment in such cases must clearly state "the purpose or purposes upon which the State intends to rely, and the State is restricted at trial to proving the purposes alleged in the indictment." *Moore*, 315 N.C. at 743, 340 S.E.2d at 404.

N.C. Gen. Stat. § 14-39 provides in relevant part that:

(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, . . . shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of: . . .

(3) [T]errorizing the person so confined, restrained or removed . . . ;

(b) There shall be two degrees of kidnapping as defined by subsection (a). If the person kidnapped either was not released by the defendant in a safe place or had been seriously injured or sexually assaulted, the offense is kidnapping in the first degree and is punishable as a Class C felony. If the person kidnapped was released in a safe place by the defendant and had not been seriously injured or sexually assaulted, the offense is kidnapping in the second degree and is punishable as a Class E felony.

N.C. Gen. Stat. § 14-39. The indictment on the charge of first-degree kidnaping in the present case stated the following:

> The jurors for the State upon their oath present that on or about the [29th day of December, 1997] and in [New Hanover County] [Kenneth A. Baldwin] unlawfully, willfully and feloniously did kidnap Cheryl [Lang], a person who had attained the age of 16 years by unlawfully confining, restraining, and removing her from one place to another without her consent and *for the purpose of terrorizing her.* Cheryl [Lang] was sexually assaulted.

(Emphasis added). Therefore, the State was limited at trial to proving that the defendant acted with the intent to terrorize Ms. Lang, and the jury was permitted to convict the defendant solely on that theory. *See Moore,* 315 N.C. at 743, 340 S.E.2d at 404; *see also State v. Taylor,* 304 N.C. 249, 283 S.E.2d 761 (1981), *cert. denied,* 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983).

In reviewing the trial court's denial of the defendant's motion to dismiss for insufficiency of the evidence to sustain a conviction, we are required to review the evidence introduced at trial "in the light most favorable to the State to determine if there is substantial evidence of every essential element of the crime." *State v. McKinnon,* 306 N.C. 288, 298, 293 S.E.2d 118, 125 (1982). Substantial evidence is that which a reasonable juror would consider sufficient to support the conclusion that each essential element of the crime exists. *Id.* As explained by our Supreme Court, we must determine "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Barnette,* 304 N.C. 447, 458, 284 S.E.2d 298, 305 (1981).

In determining whether sufficient evidence was introduced to support the jury's determination that the defendant acted with the purpose of terrorizing Ms. Lang, "the test is not whether subjectively the victim was in fact terrorized, but whether the evidence supports a finding that the defendant's purpose was to terrorize her." *Moore,* 315 N.C. at 745, 340 S.E.2d at 405. Nonetheless, the victim's subjective feelings of fear, while not determinative of the defendant's intent to terrorize, are relevant. *See, e.g., id.,* 315 N.C. at 745, 340 S.E.2d at 406 (where victim testified that she was "very scared" and "horrified"); *State v. Williams,* 127 N.C. App. 464, 468, 490 S.E.2d 583, 586 (1997) (witnesses testified that the victim was crying and hysterical throughout the ordeal). Terrorizing requires not only the intent to place the victim in a state of fear, but requires "putting [the victim] in some high degree of fear, a state of intense fright or apprehension." *Moore,* 315 N.C. at 745, 340 S.E.2d at 405 (citing *State v. Jones,* 36 N.C. App. 447,

244 S.E.2d 709 (1978)). The presence or absence of the defendant's intent or purpose to terrorize Ms. Lang may be inferred by the fact-finder from the circumstances surrounding the events constituting the alleged crime. *State v. White*, 307 N.C. 42, 48, 296 S.E.2d 267, 271 (1982).

The evidence introduced at trial, when viewed in the light most favorable to the State, showed that the defendant, while brandishing a gun, confined Ms. Lang in her apartment against her will for close to twenty hours. At no time during the ordeal in the apartment did Ms. Lang have an opportunity to leave the apartment without having to get past the defendant, who held a loaded weapon. At no time did the defendant permit her to leave the apartment, despite her repeated requests. The defendant repeatedly threatened to kill himself, pointing the gun at his own head, and stated that he wanted to kill himself in front of Ms. Lang. Ms. Lang testified that she was "petrified." We conclude that the State introduced sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that the defendant acted with the purpose of terrorizing Ms. Lang.

[3] Next, we consider the defendant's contention that the trial court erred in denying the defendant's request for a jury instruction on the lesser-included offense of false imprisonment. As there was no evidence presented from which a rational jury could have reasonably found that the defendant confined, restrained or removed Ms. Lang for some purpose other than terrorizing her, we conclude that the trial court committed no error in denying the defendant's request.

Our courts have long held that false imprisonment is a lesser-included offense of the crime of kidnaping. *See State v. Whitaker*, 316 N.C. 515, 342 S.E.2d 514 (1986). When there is any evidence introduced at trial that would permit the jury to find the defendant guilty of a lesser-included offense, the failure of the trial court to instruct the jury regarding that lesser-included offense constitutes reversible error. *Id.* at 520, 342 S.E.2d at 518. " '[W]hether a defendant who confines, restrains, or removes another is guilty of kidnapping or false imprisonment depends upon whether the act was committed to accomplish one of the purposes enumerated in' " the kidnaping statute, N.C. Gen. Stat. § 14-39. *Id.* (quoting *State v. Lang*, 58 N.C. App. 117, 118-19, 293 S.E.2d 255, 256, *disc. review denied*, 306 N.C. 747, 295 S.E.2d 761 (1982)); *see* N.C. Gen. Stat. § 14-39. As previously noted, in a kidnaping case, the indictment must state with particular-

ity the purpose with which the defendant acted, and the State can only convict the defendant of confining, restraining or removing the victim for that specified purpose. *See Moore*, 315 N.C. at 743, 340 S.E.2d at 404. We must therefore determine whether "there was evidence from which the jury could have concluded that the defendant, although restraining, confining and removing the victim, [did so] for some purpose other than" to terrorize the victim. *Lang*, 58 N.C. App. at 119, 293 S.E.2d at 257.

The evidence reflects that the defendant forced Ms. Lang into her bedroom and confined her there throughout most of the night. While in the bedroom with Ms. Lang, he repeatedly held a gun to his head and threatened to kill himself. He assured her that he did not intend to harm her, but instead only intended to harm himself. To show her that he was serious about his suicidal threats, the defendant removed his wedding ring and told Ms. Lang to give it to their daughter. He also told Ms. Lang the combination to his foot locker, where all his insurance papers could be found. When asked why he wanted to kill himself in her apartment, the defendant responded that he wanted to kill himself right in front of her.

We believe that this evidence points to one singular purpose behind the defendant's kidnaping of Ms. Lang. Specifically, by forcing her to either watch him kill himself or, at the very least, watch him point a gun at his head and repeatedly threaten to do so, the defendant intended to terrorize Ms. Lang. *See generally State v. Surrett*, 109 N.C. App. 344, 351, 427 S.E.2d 124, 128 (1993) (holding that no false imprisonment instruction was required where the evidence of defendant forcing the victim into his vehicle and instructing her to lie down and remain quiet manifested the singular purpose of terrorizing the victim; *State v. Nicholson*, 99 N.C. App. 143, 147, 392 S.E.2d 748, 751 (1990) (holding that no false imprisonment instruction was required where the evidence of defendant grabbing victim, threatening her at gunpoint, and forcing her to walk to another room in her house pointed to the singular purpose of terrorizing the victim).

The defendant, however, maintains that the evidence reasonably suggests that his purpose in kidnaping Ms. Lang was to commit suicide. We do not find this to be the case. Simply stated, in order for him to commit suicide, neither Ms. Lang's presence nor her assistance was required. Indeed, he need not have been in her home. Thus, by bringing Ms. Lang into the picture (i.e. by forcing her to remain locked with him in her bedroom while he pointed a gun at his head), the defendant was necessarily acting with some purpose apart from wanting to

commit suicide. All the evidence suggests this purpose was to terrorize Ms. Lang. The defendant's contention that the trial court erred in denying his request for an instruction on the lesser-included offense of false imprisonment is therefore overruled.

[4] Lastly, we consider the defendant's contention that the trial court erred in failing to declare a mistrial after the jury indicated its inability to reach a unanimous verdict after deliberating for six hours. After sending the jury back for further deliberations, the jury ultimately returned its verdict after approximately eight total hours of deliberations. The defendant argues that the trial court improperly coerced the jury into reaching a verdict. We disagree.

N.C. Gen. Stat. § 15A-1235 concerns jury deliberations and the matter of deadlocked juries, and provides trial judges with clear standards for instructions urging jury verdicts. N.C. Gen. Stat. § 15A-1235 (1988); *see State v. Alston*, 294 N.C. 577, 597, 243 S.E.2d 354, 367 (1978). Subsection (c) provides that "[t]he judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." N.C. Gen. Stat. § 15A-1235(c). Subsection (d), which allows for declaration of a mistrial on the same grounds as N.C. Gen. Stat. § 15A-1063, provides that "the judge *may* declare a mistrial and discharge the jury" if there appears to be "no reasonable possibility of [unanimous] agreement" among the jurors. N.C. Gen. Stat. § 15A-1235(d) (emphasis added); *see* N.C. Gen. Stat. § 15A-1063 (1988); *State v. O'Neal*, 67 N.C. App. 65, 73 n. 2, 312 S.E.2d 493, 498 n. 2, *modified*, 311 N.C. 747, 321 S.E.2d 154 (1984). "The purpose behind the enactment of N.C.G.S. § 15A-1235 was to avoid coerced verdicts from jurors having a difficult time reaching a unanimous decision." *State v. Evans*, 346 N.C. 221, 227, 485 S.E.2d 271, 274 (1997), *cert. denied*, 522 U.S. 1057, 139 L. Ed. 2d 653 (1998) (citation omitted).

It is well-settled that the decision to grant or deny a motion for mistrial lies within the sound discretion of the trial judge. *See State v. Wall*, 304 N.C. 609, 621, 286 S.E.2d 68, 76 (1982) (citations omitted); *State v. Chavis*, 134 N.C. App. 546, 552, 518 S.E.2d 241, 246 (1999), *cert. denied*, —— N.C. ——, —— S.E.2d —— (2000) (citation omitted). The trial judge's ruling on a motion for mistrial will not be disturbed on appeal "unless it is so clearly erroneous as to amount to a manifest abuse of discretion." *State v. McCarver*, 341 N.C. 364, 383, 462 S.E.2d 25, 36 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996) (citation omitted); *see State v. Nobles*, 350 N.C. 483, 511,

515 S.E.2d 885, 902 (1999); *State v. Darden*, 48 N.C. App. 128, 133, 268 S.E.2d 225, 228 (1980) ("the action of the judge in declaring or failing to declare a mistrial is reviewable only in case of gross abuse of discretion").

In reviewing whether the trial court coerced the jury into its verdict, we must consider the totality of the circumstances. *See Porter*, 340 N.C. 320, 335, 457 S.E.2d 716, 723 (1995). In reviewing the totality of the circumstances, some factors to consider are whether the trial court "conveyed an impression to the jurors that it was irritated with them for not reaching a verdict and whether the trial court intimated to the jurors that it would hold them until they reached a verdict." *Id.* (citing *State v. Beaver*, 322 N.C. 462, 464, 368 S.E.2d 607, 608 (1988)). Our courts, however, have not adopted a bright-line rule setting an outside time-limit on jury deliberations, or a rule that deliberations for a certain length of time, in relation to the length of time spent by the State presenting its evidence, is too long.

Our Supreme Court has held that "[a] jury's failure to reach a verdict due to deadlock is 'manifest necessity' justifying declaration of a mistrial." *State v. Pakulski*, 319 N.C. 562, 570, 356 S.E.2d 319, 324 (1987) (citation omitted), *rev'd on other grounds*, 326 N.C. 434, 390 S.E.2d 129 (1990). Nonetheless, the Court has upheld decisions by trial courts to continue deliberations despite jury indications that it was "at a standstill," *Porter*, 340 N.C. at 337, 457 S.E.2d at 724, or "hopelessly deadlocked." *State v. Patterson*, 332 N.C. 409, 414, 420 S.E.2d 98, 100 (1992).

In the instant case, the jury retired to the jury room at 12:29 p.m. on Friday afternoon to select its foreperson. At 1:00 p.m., the jury returned to the courtroom, indicated it had selected its foreperson, and was given a lunch recess until 2:00 p.m. The trial court resumed session at 2:00 p.m., and the jury returned to the jury room for deliberations at 2:10 p.m. The jury returned to the courtroom at 3:40 p.m. and was given a 15-minute recess. The jury returned and resumed deliberations at 3:55 p.m.

At 4:05 p.m., the court received a note from the jury foreperson reading, "Your Honor, we are at an impass[e]. What are our options?" The trial judge noted that deliberations had been ongoing for approximately two and a half hours, and returned the jury to the jury room at 4:06 p.m. for further deliberations. At 5:30 p.m., the jury returned to the courtroom, following which a dinner recess was taken until 6:35 p.m., at which time the jury returned to deliberations. The jury

returned to the courtroom at 8:40 p.m., after indicating in a note that "We cannot come to a unanimous decision on either charge." The judge gave the jury a fifteen minute recess, and upon their return issued an additional instruction, stating:

> The Court wants to emphasize the fact that it is your duty to do whatever you can to reach a verdict. You should reason the matter over together as reasonable men and women and attempt to reconcile your differences, if you can, without the surrender of conscientious convictions, but you should not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

The jury returned to deliberations at 8:58 p.m., and at 9:55 p.m. returned to the courtroom after indicating in a note to the court that "We have been at a 10-2 impass[e] for several hours. There is no way the 2 feel that they can ever change their mind." Without inquiring how the jurors were voting, the judge learned that the jury had taken "three or four" votes, and that the first and last ballots on the rape charge remained unchanged at 10-2. However, the foreperson indicated that on the kidnaping charge, the first vote was 9-3 and the last vote was 11-1. The judge concluded that the jury was making progress, and the foreperson indicated agreement. The judge asked the jury to continue deliberations, and it retired to the jury room at 10:00 p.m. The jury returned to the courtroom at 11:04 p.m. with unanimous verdicts on both charges.

The fact that the jury was required to deliberate late on a Friday night was not dispositive on the issue of coercion. *See Beaver*, 322 N.C. 464, 368 S.E.2d 608. The trial court never expressed irritation at the jury for failing to reach a unanimous verdict, or intimated that the jury would be held for an unreasonable period of time to reach such a verdict. We find the circumstances here no more indicative of coercion than those present in other cases wherein the trial court's denial of a motion for mistrial has been upheld. *See Porter*; *Patterson*. Based upon the totality of the circumstances, we conclude that the trial court's refusal to grant the defendant's motion for a mistrial was not erroneous.

No Error.

Judges LEWIS and HUNTER concur.