STATE OF NORTH CAROLINA v. JAYSON COLLINS PHILLPOTT

No. COA10-838

(Filed 19 July 2011)

**1. Evidence— prior inconsistent statements—impeachment— statement not inconsistent**

A statement given by defendant to a detective was not inconsistent with his trial testimony and the trial court did not err by introducing into evidence the statement on direct examination by the State. Reading the statement in context, the witness was stating that he knew of the person called Phillpott, not that he was personally acquainted with him, which was consistent with his testimony in court. The only issue on appeal is the consistency of the statement, not whether the State was surprised.

**2. Jury— not in agreement—mistrial denied—no abuse of discretion**

The trial court did not abuse its discretion by not declaring a mistrial even after one juror had indicated that nothing would change.

**3. Homicide— first-degree murder—premeditation and deliberation— evidence sufficient**

There was sufficient evidence of premeditation and deliberation in a first-degree murder prosecution where there was testimony from witnesses who did not hear provocation from the deceased; testimony from a witness at whom defendant pointed the gun after shooting the victim; and testimony from a doctor who noted that the victim had five gunshot wounds, four of which were to the head.

Judge BEASLEY concurring.

Appeal by defendant from judgment entered on or about 19 November 2009 by Judge Cy A. Grant in Superior Court, Edgecombe County. Heard in the Court of Appeals 14 December 2010.

*Attorney General Roy A. Cooper, III, by Richard L. Harrison, for the State.*

*McCotter, Ashton & Smith, P.A., by Rudolph A. Ashton, III and Kirby H. Smith, III, for defendant-appellant.*

STROUD, Judge.

Defendant was convicted of first degree murder. For the following reasons, we find no error.

## I. Background

On 18 May 2009, defendant was indicted for first degree murder. On 16-19 November 2009, defendant was tried by a jury. At trial, the State's evidence tended to show that on the evening of 10 September 2008, Terron Barnes was at Shawan Jones's apartment with Mr. Jones and his wife, Allison Jones. Two other men, one of whom Mr. Barnes recognized as Akeem Davis, arrived at Mr. Jones's apartment. According to Mr. Barnes, Mr. Davis asked to purchase marijuana, and Mr. Jones left the room to get it; Mr. Barnes went to the bathroom and while there he heard gunshots. Ms. Jones testified that defendant was the shooter. Dr. William Russell Oliver, an expert in forensic pathology, testified Mr. Jones died from "[m]ultiple gunshot wounds to the head[.]" The jury found defendant guilty of first degree murder. Defendant had a prior record level of III and was sentenced to life imprisonment without parole. Defendant appeals.

## II. Prior Inconsistent Statement

[1] During defendant's trial, on direct examination, Mr. Davis testified that defendant, the man sitting in the courtroom in front of him, was not the shooter. The State then called Detective Michael Lewis of the Rocky Mount Police Department to the stand. Detective Lewis read the following statement from Mr. Davis into evidence:

I was going to Shawan's house to get a shot of liquor.

As I walked in, the guy who shot Shawan walked in right before me. I wasn't with him. . . . . The shooter started talking to Shawan. I then started talking to Allison, Shawan's wife.

After that, I told Shawan what I wanted. Shawan told his wife to go get my order. I looked down and I heard four or five shots. I looked up and saw the shooter fire the gun.

After I heard the shots, I ran when I was locked up in Maryland. I heard the shooter's name was Phil[l]pott. I knew him from the streets as Pott. I had no association with him before that night.

I had seen him around Edgecombe Meadows. Phil[l]pott was 5'6 to 5'8, long dreads, chubby and stocky, brown skin. I can't remember the clothing. The gun was a chrome and black handgun. I had nothing to do with the shooting. I was there only to buy liquor.

Defendant objected both before and after the statement was read and made a motion to strike the statement; both objections were overruled and the motion was denied. After the ruling on the objections and the motion, Detective Lewis also testified that Mr. Davis had picked a photograph of the shooter out of a line-up.

Defendant now "contends that the trial court erred in overruling defendant's objections to the reading of his prior statement to the jury by Detective Lewis. Although Davis admitted giving the statement, it was inconsistent to his trial testimony and involved crucial material facts." After a thorough review of Mr. Davis's testimony we do not conclude that the statement read by Detective Lewis was an inconsistent statement.

Black's Law Dictionary defines a "prior inconsistent statement" as "[a] witness's earlier statement that conflicts with the witness's testimony at trial." Black's Law Dictionary 1539 (9th ed. 2009). Mr. Davis's statement, as read by Detective Lewis provided in pertinent part that Mr. Davis: "heard the shooter's name was Phil[l]pott. I knew him from the streets as Pott. I had no association with him before that night. I had seen him around Edgecombe Meadows. Phil[l]pott was 5'6 to 5'8, long dreads, chubby and stocky, brown skin."

During trial, Mr. Davis testified that he did not know the shooter and then the following dialogue took place:

Q. Now, in your statement that you gave to police, who did you say—who did you tell them shot Shawan Jones?

A. I told them I heard it was a guy named Pot.

Q. Why did you tell them that?

A. Pretty much I told them that because I thought it's what he wanted to hear. Because I was up in Maryland and I heard they were looking for a guy named Pot.

Q. Is Jayson Phil[l]pott the person who shot Shawan Jones?

A. If that's supposed to be Jayson Phil[l]pott, No.

Q. And you didn't know who this guy was?

A. I ain't know him. I know of him. I heard his name.

Both to the police and at trial Mr. Davis stated that he had heard the shooter's name was "Pott" and that he had no prior association with him. The concurring opinion characterizes the evidence as follows:

In Davis' prior statement to Detective Lewis, he stated that he "knew [Defendant] from the streets as Pott[,]"[] "had seen him around Edgecombe" and he further provided a physical description of Defendant. Davis had also told Detective Lewis that he knew that Defendant shot Shawan Jones because he "looked up and saw the shooter fire the gun" and the shooter walked in Shawan's house "right before [Davis]."

In contrast, on direct examination by the State, Davis denied that he knew Defendant and testified that he told Detective Lewis that the identity of the shooter was Defendant because "I thought it's what he wanted to hear." When asked, "[i]s Jayson Phil[l]pot the person who shot Shawan Jones?" Davis replied, "[i]f that's supposed to be Jayson, Phil[l]pot, no[.]"[] Prosecutor asked Davis, *"[a]nd you didn't know who this guy was"* (emphasis added) and Davis replied "I ain't know him. I know of him. I heard his name."

We do not believe that this characterization of the evidence considers Mr. Davis's statements in the proper context.

Mr. Davis plainly stated to the police that he "heard the shooter's name was Phil[l]pott. I knew him from the streets as Pott. I had no association with him before that night." The concurrence uses Mr. Davis's word "knew" as connoting a personal knowledge of Phillpott. But upon reading the entire statement in context, Mr. Davis is stating that he "knew of" the person called Phillpott, not that he was personally acquainted with him; hence the following sentence that "I had no association with him before that night." Mr. Davis is consistent with this statement on the stand when he was asked, "And you didn't know who this guy was?" and responded, "I ain't know him. I know of him. I heard his name." (Emphasis added.) Both Mr. Davis's statement, read as a whole, and his testimony make it clear that while Mr. Davis was aware of a person named Phillpott who lived in the area, he was

not personally acquainted with that person. Our reading of Mr. Davis's testimony is further clarified in the transcript upon further direct examination:

> Q. . . . Now, do you recall speaking to Detective Rick Miller on Saturday.
>
> A.  Yeah, I talked to him.
>
> Q.  What did you tell him about your statement?
>
> A.  I told him the statement was true.
>
> Q.  So what's changed between Saturday and today?
>
> A.  I mean, nothing's changed. The statement is still the same. I mean, that's what happened. I came in to buy a shot of liquor. Somebody walked in in front of him [sic]. And I told Shawan to give me a shot of liquor. He told Allison to go get it. She got it. Next thing I know I seen shots fired off.
>
> Q.  Doesn't your statement also say that the shooter—the shooter's name was Phil[l]pott. Isn't that what you say in your statement?
>
> A.  In the statement, it say I heard the shooter's name was Phil[l]pott.
>
> Q.  Do you know Jayson Phil[l]pott?
>
> A.  Huh-Uh (No.) I mean, I ain't know it was Phil[l]pott. Actually, I say I heard the first name was Pot.
>
> Q.  Are you friends with him?
>
> A.  I told you I know of him.

(Emphasis added.)

Mr. Davis's statement said that he "saw the shooter" and that he "heard the shooter's name was Phillpott[.]" (Emphasis added.) Mr. Davis's statement to the police plainly provides that he was an eyewitness who saw the shooter and that he later heard that the person who was the shooter was Phillpott. In other words, Mr. Davis's statement was not that he saw the shooter, and it was defendant; his testimony was that he saw the shooter and that he later heard that the shooter's name was Phillpott, a person whom he knew of, although he was not personally acquainted with him. In summary, both Mr. Davis's statement to the police and trial testimony are consistent in stating

that (1) he saw the shooter, but he was not with him, and (2) he was told that the shooter was someone named Phillpott, whom he did not know personally but of whom he was aware. Other portions of Mr. Davis's testimony conform to our determination that the statement and the testimony were consistent:

On direct examination:

    Q. Tell us—when you went over what happened when you walked in. Was anybody with you?

    A. No, I weren't with nobody. Somebody walked in before I did.

    . . . .

    A. . . . the person that walked in right before me was talking to Shawan then. Next thing I know shots fired off.

    Q. Did you know who this person was?

    A. No, I ain't know him.

    Q. You didn't know him from around the neighborhood at all?

    A. I mean

    THE COURT:    Keep your voice up, sir.

    A. No, sir.

    . . . .

    Q. And do you see that person in the courtroom today? The person who shot Shawan Jones.

    A. No, sir.

    Q. You don't see him in the courtroom today.

    A. Huh-Uh (No.) Huh-Uh (No.)

    THE COURT: Keep your voice up.

    A. No, sir.

    THE COURT: What did you say?

    A. No, sir.

    . . . .

Q. And you're saying today you don't see the person who shot Shawan Jones.

A. No, sir.

. . . .

Q. Now, you said you didn't know Jayson Phil[l]pott, right?

A. I told you I knew of him.

As Mr. Davis's statement to the police and his trial testimony are consistent, the inconsistency arises because Mr. Davis failed to identify defendant in the courtroom as the shooter, even though he had picked defendant's photograph out of a photo line-up. Yet this argument fails as it was not preserved for appeal; defendant failed to object to the admission of the photo line-up into evidence and/or Detective Lewis's testimony identifying the photograph which Mr. Davis chose. *See* N.C.R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion."). The only issue on appeal is whether defendant's statement to the police is inconsistent with his testimony at trial; we have concluded that it is not. While the concurrence may be correct in concluding that the State was surprised, the surprise came when Mr. Davis failed to identify defendant in the courtroom as the same person he had picked in the photo line-up. We are considering only Mr. Davis's statement to the police, and as we conclude that Mr. Davis's statement to the police and his trial testimony were consistent, defendant's argument regarding a prior inconsistent statement is without merit.[1]

### III. Jury Deliberations

[2] At the end of defendant's case the jury began deliberating at 10:40 a.m., went to lunch from 12:35 p.m. to 1:35 p.m., asked a question at 4:10 p.m., and then at 5:15 p.m., the following dialogue took place:

---

1. We need not consider whether defendant's statement to the police, which was consistent with his trial testimony, should have been read to the jury because defendant makes no argument regarding this issue, but instead focuses solely on the inconsistency of the statement Mr. Davis provided to the police and his trial testimony. *See* N.C.R. App. P. 28(a) ("The scope of review on appeal is limited to issues so presented in the several briefs.")

THE COURT: Mr. Daughtridge, I'm assuming that the jury has not reached a verdict, is that correct?

MR. DAUGHTRIDGE: That's correct.

THE COURT: All right. I'm going to give the jury two options and these are the only two. Option 1 would be to continue to deliberate this evening with a view towards reaching a verdict or option 2 taking a recess at this time and returning in the morning. Do you want to go back at this time or do you think you pretty much know what you what to do as you sit here[?]

MR. DAUGHTRIDGE: Go on.

THE COURT: Is that the general consensus?

JUROR No. 10: It's not going to change so.

THE COURT: Well, no, you only have two options, stay later or come back in the morning. Do you want to go back to the jury room and then come back and tell me[?]

MR. DAUGHTRIDGE: Yes, we can.

THE COURT: All right. Return to the jury room and then come back and let me know what your decision is. Thank you. Any objection to anything I said from the State?

THE STATE: No, sir.

THE COURT: From the defense.

MR. TUCKER: No, sir, your Honor.

THE COURT: Mr. Daughtridge, what is the decision of the jury?

MR. DAUGHTRIDGE: We'll come back tomorrow.

When the trial resumed the next day, defendant made a motion for a mistrial

based on the fact that the jury deliberated yesterday from about 10:30, 10:45 until about ten (sic) yesterday. And upon inquiry from the court as to whether they wanted to continue deliberations either last night or this morning one of the jurors even stated that I believe it was number 10 that [to] continue deliberations, in her words, wouldn't change anything. So I would ask the court to consider at this time, based on the length of the deliberations yes-

terday and that statement that I hope is gathered in the record that the court would declare a mistrial.

The trial court denied defendant's motion for a mistrial, and upon continuing deliberations the jury reached a verdict in fifty-five minutes.

On appeal, defendant contends that "the trial court erred in refusing to declare a mistrial and allowing the jury to go home and return the next day to continue deliberating after the jury had deliberated nearly 7 hours and, upon inquiry, Juror #10 stated that to continue would not change anything." (Original in all caps.) Defendant argues that the jury was coerced into reaching a verdict and that the facts indict that "these juror(s) surrender[ed] their honest convictions as to the weight and effect of the evidence to conform with the opinion of the fellow jurors for the mere purpose of returning a verdict."

Defendant relies upon N.C. Gen. Stat. § 15A-1235(d) for its argument that there should have been a mistrial. N.C. Gen. Stat. § 15A-1235 provides that "[i]f it appears that there is no reasonable possibility of agreement, the judge may declare a mistrial and discharge the jury." N.C. Gen. Stat. § 15A-1235(d) (2009).

"The action of the judge in declaring or failing to declare a mistrial under N.C. Gen. Stat. § 15A-1235 is reviewable only in case of gross abuse of discretion. Our review must take into account the totality of the circumstances." *State v. Rasmussen*, 158 N.C. App. 544, 556, 582 S.E.2d 44, 53 (citation, quotation marks, and brackets omitted), *disc. review denied*, 357 N.C. 581, 589 S.E.2d 362 (2003). N.C. Gen. Stat. § 15A-1235(d) "does not mandate the declaration of a mistrial; it merely permits it." *State v. Darden*, 48 N.C. App. 128, 133, 268 S.E.2d 225, 228 (1980). Furthermore,

> [o]ur courts . . . have not adopted a bright-line rule setting an outside time-limit on jury deliberations, or a rule that deliberations for a certain length of time, in relation to the length of time spent by the State presenting its evidence, is too long.
>
> Our Supreme Court has held that a jury's failure to reach a verdict due to deadlock is manifest necessity justifying declaration of a mistrial. Nonetheless, the Court has upheld decisions by trial courts to continue deliberations despite jury indications that it was at a standstill, hopelessly deadlocked.

*State v. Baldwin*, 141 N.C. App. 596, 608, 540 S.E.2d 815, 823-24 (2000) (citations, quotations marks, and brackets omitted). In *State v. Osorio*, the

[d]efendant contend[ed] that at the time the *jury announced they were deadlocked after deliberating nine hours over three days* that the trial court should have declared a mistrial because the instruction given at that time led the jurors to believe they had to reach a verdict before they would be allowed to go home.

196 N.C. App. 458, 463, 675 S.E.2d 144, 147 (2009) (emphasis added). This Court concluded that defendant's argument was meritless noting that

> our prior cases indicate that the amount of time that the jury deliberated in the case at bar was not so long as to be coercive in nature. *See State v. Jones*, 47 N.C. App. 554, 562, 268 S.E.2d 6, 11 (1980) (stating a two-day period is not an "unreasonable" period under N.C. Gen. Stat. § 15A-1235); *see also State v. Beaver*, 322 N.C. 462, 465, 368 S.E.2d 607, 609 (1988) (holding that there was no coercion by the trial court where the jury deliberated all day Friday and all day Saturday). Without any other evidence of coercion or error on the part of the trial court, defendant's contention that the duration of the deliberations alone is enough to warrant a mistrial is without merit. The nine hours of deliberation is not itself indicative of coercive conduct, and when viewing the totality of the circumstances, the trial judge did not abuse his discretion in instructing the jurors pursuant to N.C. Gen. Stat. § 15A-1235.

*Id.* at 465-66, 675 S.E.2d at 148; *see also Baldwin*, 141 N.C. App. at 608-09, 540 S.E.2d at 824 (determining that the trial court did not err in refusing to declare a mistrial after approximately ten and one-half hours from the beginning of deliberations until the jury reached a verdict and with the jurors statements that they had "been at a[n] . . . impasse for several hours" and "[t]here is no way" some of the jurors could "ever change their mind"); *Darden*, 48 N.C. App. at 133, 268 S.E.2d at 228 (determining that "[e]ven assuming that the response of the jury foreman after one hour and thirty-four minutes of deliberation the first day and twenty-five additional minutes the second day made it apparent to the judge that there was no reasonable possibility of agreement, the action of the judge in declaring or failing to declare a mistrial is reviewable only in case of gross abuse of discretion. [The d]efendant has failed to carry the burden of showing such abuse here" (quotation marks omitted)). In the present case, the jury deliberated approximately seven hours over the course of two days, even with the announcement from juror number 10 that nothing would "change[,]" we do not conclude that the trial court erred in refusing to declare a mistrial. *See Osorio*, 196 N.C. App. at 465-66, 675 S.E.2d

at 148; *Baldwin,* 141 N.C. App. at 608-09, 540 S.E.2d at 824; *Darden,*
48 N.C. App. at 133, 268 S.E.2d at 228. This argument is overruled.

## IV. Motion to Dismiss

**[3]**  Lastly, defendant contends that "the trial court erred in denying
defendant's motion to dismiss and renewed motion to dismiss the
first degree murder charge for insufficiency of the evidence, and in
particular for insufficiency of the evidence of premeditation and
deliberation." (Original in all caps.)

> The standard of review for a motion to dismiss is well known.
> A defendant's motion to dismiss should be denied if there is sub-
> stantial evidence of: (1) each essential element of the offense
> charged, and (2) of defendant's being the perpetrator of the
> charged offense. Substantial evidence is relevant evidence that a
> reasonable mind might accept as adequate to support a conclu-
> sion. The Court must consider the evidence in the light most
> favorable to the State and the State is entitled to every reasonable
> inference to be drawn from that evidence. Contradictions and dis-
> crepancies do not warrant dismissal of the case but are for the
> jury to resolve.

*State v. Johnson,* —— N.C. App. ——, ——, 693 S.E.2d 145, 148 (2010)
(citations and quotation marks omitted).

"The elements of first-degree murder are: (1) the unlawful killing,
(2) of another human being, (3) with malice, and (4) with premedita-
tion and deliberation." *State v. Coble,* 351 N.C. 448, 449, 527 S.E.2d 45,
46 (2000).

> Malice, as it is ordinarily understood, means not only hatred, ill
> will, or spite, but also that condition of mind which prompts a
> person to take the life of another intentionally, without just
> cause, excuse, or justification, or to wantonly act in such a manner
> as to manifest depravity of mind, a heart devoid of a sense of
> social duty, and a callous disregard for human life.

> Malice, in terms of hatred, ill will or spite, is generally referred to
> as express malice; whereas, implied malice originates from a con-
> dition of mind that prompts a person to intentionally inflict damage
> without just cause, excuse or justification. Furthermore, it is
> well-established that the intentional use of a deadly weapon gives
> rise to a presumption that the killing was unlawful and that it was
> done with malice.

*State v. Bruton*, 165 N.C. App. 801, 805-06, 600 S.E.2d 49, 53 (2004) (citations, quotation marks, and brackets omitted).

> Premeditation means that the act was thought out before-hand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. Premeditation and deliberation can be inferred from many circumstances, some of which include:
>
> > (1) absence of provocation on the part of deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Wiggins*, —— N.C. App. ——, ——, 707 S.E.2d 664, 673 (citations and quotation marks omitted), *disc. review denied*, —— N.C. ——, ——, 707 S.E.2d 242 (2011).

The State presented evidence that Ms. Jones saw defendant shoot Mr. Jones. Dr. Oliver testified that Mr. Jones died from "[m]ultiple gunshot wounds to the head." Specific evidence of premeditation and deliberation was shown through the testimonies of both Ms. Jones and Mr. Barnes who heard no "provocation on [the] part of the deceased[;]" through the testimony of Ms. Jones that after shooting Mr. Jones defendant pointed the gun at her; and through the testimony of Dr. Oliver who noted that Mr. Jones had a total of five gunshot wounds, four of which were to the head. *See id.* Viewed in the light most favorable to the State, there was "substantial evidence of: (1) each essential element of the offense charged, and (2) of defendant's being the perpetrator of the charged offense." *Johnson*, —— N.C. App. ——, ——, 693 S.E.2d at 148. Accordingly, the trial court did not err in denying defendant's motion to dismiss.

## V. Conclusion

For the foregoing reasons, we find no error.

NO ERROR.

Judge Bryant concurs.

Judge Beasley concurs with separate opinion.

BEASLEY, Judge concurring with separate opinion.

While I concur with the majority opinion that the trial court did not commit error, I believe that the trial court properly admitted Akeem Davis' statement to Detective Lewis as a prior inconsistent statement.

The trial court may permit the State to impeach its own witness when "the district attorney has been misled and surprised by [its] **witness**, whose testimony as to a material fact is contrary to what the **State** had a right to expect." *State v. McDonald*, 312 N.C. 264, 269, 321 S.E.2d 849, 852 (1984) (internal quotation marks omitted). "Surprise" means more than "mere disappointment"; in this context it is defined as "*taken unawares.*" ***State** v. Smith*, 289 N.C. 143, 158, 221 S.E.2d 247, 256 (1976).

For the State to be allowed to impeach its own witness, it must abide by the following procedure. The State should move "to . . . impeach its own witness by proof of his prior inconsistent statements"; (2) the motion should be made as soon as the prosecutor is surprised; (3) the motion "is addressed to the sound discretion of the trial court"; (4) the preliminary questions of whether the prosecutor is surprised and misled as to the witness' expected testimony on a material fact is to be determined in a *voir dire* hearing in the absence of the jury; and (5) "[i]f the trial judge finds that the State should be allowed to offer prior inconsistent statements, his findings should also specify the extent to which such statements may be offered." *State v. Pope*, 287 N.C. 505, 512-13, 215 S.E.2d 139, 145 (1975); *State v. Cope*, 309 N.C. 47, 305 S.E.2d 676 (1983).

As with any impeachment, the admission of the prior inconsistent statement is not considered substantive evidence, but instead permitted to demonstrate the element of surprise to the State by its witness' unanticipated testimony. *State v. Woods*, 33 N.C. App. 252, 256, 234 S.E.2d 754, 757 (1977). Any statement offered to show that it is inconsistent with the witness' current testimony must have previously been given to a law enforcement officer or other person who represents the district attorney's office. *Id.*

The State, in the case *sub judice*, followed the above procedure. Davis had informed the State prior to trial that his testimony would be consistent with his prior statement to Detective Lewis.

In Davis' prior statement to Detective Lewis, he stated that he "knew [Defendant] from the streets as Pott", "had seen him around Edgecombe" and he further provided a physical description of Defendant. Davis had also told Detective Lewis that he knew that Defendant shot Shawan Jones because he "looked up and saw the shooter fire the gun" and the shooter walked in Shawan's house "right before [Davis]."

In contrast, on direct examination by the State, Davis denied that he knew Defendant and testified that he told Detective Lewis that the identity of the shooter was Defendant because "I thought it's what he wanted to hear." When asked, "[i]s Jayson Phil[l]pot the person who shot Shawan Jones?" Davis replied, "[i]f that's supposed to be Jayson, Phil[l]pot, no". Prosecutor asked Davis, *"[a]nd you didn't know who this guy was"* (emphasis added) and Davis replied "I ain't know him. I know of him. I heard his name."

The trial court properly allowed the State to impeach its own witness as Davis' statements to Detective Lewis were not consistent with his testimony and the State was "taken unawares." Because I agree with the balance of the majority's analysis and believe that it reached the correct result, I concur in the majority's result only.