STATE OF NORTH CAROLINA v. CURLEY JACOBS

No. COA04-963

(Filed 2 August 2005)

## 1. Kidnapping— to terrorize victim—evidence sufficient

The test for sufficiency of the evidence of kidnapping to terrorize the victim is whether defendant's purpose was to terrorize, not whether the victim was in fact terrorized. Here, there was sufficient evidence that defendant kidnapped the victim

STATE v. JACOBS

[172 N.C. App. 220 (2005)]

to terrorize her even though he apologized to her during the incident, and the trial court did not err by failing to instruct on false imprisonment.

## 2. Witnesses— reluctant witness—reasons for reluctance— recross-examination limited

The trial court did not abuse its discretion by limiting the recross-examination of a kidnapping victim about her reluctance to testify and the State's threat of a contempt charge. There was no indication of an offer of favorable treatment, the reasons behind her reluctance did not bear on her credibility, and defendant did not show that the verdict was improperly influenced.

## 3. Jury— improper contact—conversation possibly overheard in courtroom

There was no abuse of discretion in the trial court's investigation or ruling on an improper contact with a juror where a juror remained seated during a recess and may have overheard a conversation between the prosecutor and the clerk. The alleged inappropriate contact occurred in the presence of the judge, who was about the same distance from the conversation as the juror and did not hear what was discussed; defense counsel was not certain what was discussed; and there is no indication of any influence on the juror or the verdict.

## 4. Evidence— deferred ruling—no abuse of discretion

The trial court did not abuse its discretion by deferring a ruling where it had granted a motion in limine to exclude certain State's evidence, the court indicated at trial that it might allow the excluded evidence if defendant offered evidence which opened the door but would not rule in advance, and defendant made an offer of proof but did not introduce its evidence.

## 5. Sentencing— aggravating factor—*Blakely* error—jury required

The trial court erred by sentencing defendant in the aggravated range for kidnapping by unilaterally finding as an aggravating factor that defendant committed the offense to disrupt and hinder the lawful exercise of a governmental function or the enforcement of the laws without submitting this aggravating factor to the jury for proof beyond a reasonable doubt.

**6. Indigent Defendants— attorney fees—notice and opportunity for hearing**

A judgment for attorney fees against an indigent defendant pursuant to N.C.G.S. § 7A-455 was remanded where it did not include his appointed attorney's total hours or the total amount of the fee and there was no indication in the record that defendant was notified of and given an opportunity to be heard regarding those matters.

Appeal by defendant from judgment entered 21 November 2003 by Judge Donald Jacobs in Robeson County Superior Court. Heard in the Court of Appeals 10 March 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Alexandra M. Hightower, for the State.*

*Stubbs, Cole, Breedlove, Prentis & Biggs, P.L.L.C., by C. Scott Holmes, for defendant-appellant.*

TIMMONS-GOODSON, Judge.

Curley Jacobs ("defendant") appeals his conviction for second-degree kidnapping. For the reasons discussed herein, we hold that defendant received a trial free of prejudicial error, but we vacate the trial court's imposition of attorney's fees and we remand the case for resentencing.

The State's evidence presented at trial tends to show the following: On 3 April 2002, Holly Powers ("Powers") was in Maxton, North Carolina, visiting a friend when she was informed that someone was waiting outside to see her. When Powers walked outside, she saw defendant standing beside a vehicle "hollering and screaming" and holding a "mini 14" rifle. Defendant asked Powers why she had obtained another restraining order against him. Defendant told Powers that she was going to go with him to get the restraining order dropped, and he grabbed Powers and forced her into the vehicle. Defendant thereafter placed Powers in "something like a head lock" and drove away.

Defendant drove Powers to a residence where he was living and "snatched" her out of the vehicle by her arm. Defendant then began pointing the gun at Powers and throwing "20 ounce bottles" at her. Defendant hit Powers in the head with a bottle, and he tore Powers' shirt off of her. Defendant choked Powers "[l]ong enough" to make

her "lose [her] breath" as well as her consciousness. Defendant then "snapped out or something" and apologized to Powers. Defendant drove Powers back to her vehicle but then instructed her to drive her vehicle back to the residence. Defendant told Powers that if she tried to leave, "he would shoot [her] car up." Defendant followed Powers in his vehicle with the rifle "out the window a little bit." After Powers dropped her vehicle off at the residence, defendant drove Powers to his mother's residence in Laurinburg, North Carolina.

Following their arrival at his mother's residence, defendant and Powers sat in defendant's vehicle and talked until defendant's mother came outside and approached the vehicle. Defendant's mother was "kind of ill" with Powers and was "fussing" at her. Defendant told his mother that Powers was not there "on [her] own free will," and that she needed to go back inside the residence. Defendant's mother asked Powers to come inside and, while defendant was in another room, Powers explained the events to her.

As Powers was talking to defendant's mother, Michelle Locklear ("Locklear"), Powers' roommate, called the residence and asked to speak to Powers. Defendant's mother attempted to give the telephone to defendant, but defendant refused to come out of the room to answer it. Powers thereafter located another telephone and called Locklear herself. Powers told Locklear to call the police, and she then asked defendant if she could see their dog, which was located in a pen in the yard. Once outside, Powers ran to a nearby residence where she called the police herself. As Powers was waiting for law enforcement officials to arrive, she noticed Locklear approaching in her vehicle. Powers entered Locklear's vehicle and the two drove to pick up Powers' vehicle at defendant's residence.

Law enforcement officers subsequently located defendant driving his vehicle a short distance away from his mother's residence. Scotland County Sheriff's Department Lieutenant Richard J. Best ("Lieutenant Best") approached defendant's vehicle and saw "an assault rife that was in the floor board behind the driver's seat[.]" Lieutenant Best took custody of the rifle and thereafter transferred it to Robeson County Sheriff's Department Detective Anthony Thompson ("Detective Thompson").

After taking her vehicle back to her residence, Powers traveled to a police station in Scotland County. She later went to a police station in Robeson County, where she was interviewed by Detective Thompson as well as Robeson County Sheriff's Department

Deputy Stuart Williams ("Deputy Williams"). The officers took a statement from Powers regarding the incident, and they photographed her injuries.

Defendant was subsequently arrested and indicted for first-degree kidnapping. Defendant's trial began the week of 19 November 2003, and on 21 November 2003, the jury found defendant guilty of second-degree kidnapping. Following the jury verdict, the trial court found as an aggravating factor that defendant committed the offense to disrupt and hinder the lawful exercise of a governmental function or the enforcement of laws. The trial court thereafter sentenced defendant to fifty-eight to seventy-nine months incarceration. Defendant appeals.

---

We note initially that defendant's brief contains arguments supporting only six of the nineteen original assignments of error. Pursuant to N.C.R. App. P. 28(b)(6) (2005), the thirteen omitted assignments of error are deemed abandoned. Therefore, we limit our present review to those assignments of error properly preserved by defendant for appeal.

The issues on appeal are whether the trial court erred by: (I) refusing to instruct the jury on false imprisonment; (II) limiting the scope of defendant's recross-examination of Powers; (III) refusing to inquire further into an alleged communication with a juror; (IV) refusing to rule on an evidentiary issue; (V) sentencing defendant in the aggravated range; and (VI) imposing attorney's fees upon defendant.

**[1]** Defendant first argues that the trial court erred by refusing to instruct the jury on false imprisonment. We disagree.

N.C. Gen. Stat. § 14-39 (2003) provides in pertinent part as follows:

(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person . . . shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:

. . . .

(3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person . . . .

. . . .

(b) There shall be two degrees of kidnapping as defined by subsection (a). If the person kidnapped either was not released by the defendant in a safe place or had been seriously injured or sexually assaulted, the offense is kidnapping in the first degree and is punishable as a Class C felony. If the person kidnapped was released in a safe place by the defendant and had not been seriously injured or sexually assaulted, the offense is kidnapping in the second degree and is punishable as a Class E felony.

"Our courts have long held that false imprisonment is a lesser-included offense of the crime of kidnapping." *State v. Baldwin*, 141 N.C. App. 596, 605, 540 S.E.2d 815, 822 (2000). "The difference between kidnapping and the lesser-included offense of false imprisonment is the purpose of the confinement, restraint, or removal of another person." *State v. Lancaster*, 137 N.C. App. 37, 44, 527 S.E.2d 61, 66, *disc. review denied in part*, 352 N.C. 680, 545 S.E.2d 723 (2000). "If the purpose of the restraint was to accomplish one of the purposes enumerated in N.C. Gen. Stat. § 14-39, then the offense is kidnapping. However, if the unlawful restraint occurs without any of the purposes specified in the statute, the offense is false imprisonment." *State v. Claypoole*, 118 N.C. App. 714, 718, 457 S.E.2d 322, 324 (1995).

In the instant case, defendant was charged with kidnapping Powers for the purpose of terrorizing her. "Terrorizing is defined as 'more than just putting another in fear. It means putting that person in some high degree of fear, a state of intense fright or apprehension.' " *State v. Davis*, 340 N.C. 1, 24, 455 S.E.2d 627, 639 (1995) (quoting *State v. Moore*, 315 N.C. 738, 745, 340 S.E.2d 401, 405 (1986)). Defendant contends that sufficient evidence was presented to demonstrate that he acted with some other purpose than to terrorize Powers. In support of this contention, defendant cites Powers' trial testimony, in which she stated that she was "[a] little bit frightened" during the incident, that defendant told her that he was kidnapping her to force her to drop the restraining order against him, and that defendant apologized to her and stated "he would quit doing drugs and stuff like that" after they reached his mother's residence.

In determining whether sufficient evidence supports a charge of kidnapping for the purpose of terrorizing, "the test is not whether subjectively the victim was in fact terrorized, but whether the evidence supports a finding that the defendant's purpose was to terrorize" the victim. *Moore*, 315 N.C. at 745, 340 S.E.2d at 405. "The pres-

ence or absence of the defendant's intent or purpose to terrorize [the victim] may be inferred by the fact-finder from the circumstances surrounding the events constituting the alleged crime." *Baldwin*, 141 N.C. App. at 605, 540 S.E.2d at 821. In the instant case, the State's evidence tends to show that defendant approached Powers with a rifle, grabbed her by her hair, and forced her into his vehicle. Once she was inside his vehicle, defendant placed Powers in a headlock, choked her, and caused her to hit her head against the side of the vehicle. Defendant held Powers in a headlock and hit her with his fists as he drove to his residence, and, once at the residence, defendant threw objects at Powers and choked her, causing her to lose consciousness. Defendant waved the rifle at Powers during the incident, "pulling the trigger off and letting it snap" while the rifle was facing Powers. Powers testified that the rifle was equipped with a laser-pointed scope and that she was scared of it. After forcing Powers to retrieve her vehicle, defendant told Powers that he would shoot her vehicle if she "tried to get away," and he held the rifle out of the window of his vehicle while he followed Powers. Detective Thompson testified that Powers was crying and was "very emotional and tearful" when he interviewed her following the incident. Powers' statement to Detective Thompson was introduced into evidence for corroborative purposes, and it provides the following pertinent narrative of the incident:

> [Defendant] made me walk in the building. My back was to [defendant] and he hit me in the head with his fist three to four times. I fell to the couch. [Defendant] put the gun to my face with the infrared and told me he would kill me. [Defendant] pulled the trigger and it snapped. [Defendant] put the gun down, came back over to me and snatched my shirt off and ripped it off of me. After [defendant] ripped my shirt off, I had my bra on. I got up off of the couch and I went towards the bedroom to see if I could find something to put on. [Defendant] hit me with his open hand hard on the back of my neck. I fell on the bed. I stood back up, [defendant] grabbed me around the throat and was choking me. [Defendant] was saying I was not going to do him like that. [Defendant] shoved me down on the bed by my throat, and he fell on top of me. I passed out for about ten seconds. [Defendant] was hitting me in the head with 20 ounce plastic drink bottles.

In light of the foregoing, we conclude that the State introduced sufficient evidence to demonstrate that defendant restrained Powers

for the purpose of terrorizing her. Although we recognize that defendant apologized to Powers during the incident and told Powers that he wanted her to drop the restraining order against him, "none of the acts he committed within the residence [or during the incident] furthered these asserted goals." *State v. Mangum*, 158 N.C. App. 187, 194, 580 S.E.2d 750, 755, *disc. review denied*, 357 N.C. 510, 588 S.E.2d 378 (2003).

In *Mangum*, the defendant was charged with kidnapping for the purpose of raping the victim. On appeal, he argued that the evidence also tended to show that he merely wished to use the telephone and engage in "horseplay" with the victim when he entered her home. This Court noted that although the defendant asked to use the telephone when he entered the victim's home, evidence introduced at trial also tended to show that, after asking to use the telephone, the defendant forced the victim to the bedroom, pinned her down, and fondled her until law enforcement officials arrived. *Id.* In light of this evidence, we "fail[ed] to see how [the] defendant's restraint of the victim and the repeated touching of the breast and vagina furthered his stated intent of using the telephone or restroom." *Id.* at 197, 580 S.E.2d at 757. We concluded that the defendant's "overtly sexual actions also belie his assertion that he was merely engaging in 'horseplay' with the victim." *Id.* Therefore, we held that the trial court did not err by failing to instruct on false imprisonment. *Id.* In the instant case, we are likewise unpersuaded that defendant's continual threats, restraint, and blows upon Powers advanced his asserted goal of forcing her to drop the restraining order against him. Accordingly, we overrule defendant's first argument.

[2] Defendant next argues that the trial court erred by limiting his recross-examination of Powers. Defendant asserts that he was denied the right to effective cross-examination. We disagree.

"Cross-examination of an opposing witness for the purpose of showing his bias or interest is a substantial legal right. Jurors are to consider evidence of any prejudice in determining the witness' credibility." *State v. Grant*, 57 N.C. App. 589, 591, 291 S.E.2d 913, 915, *disc. review denied*, 306 N.C. 560, 294 S.E.2d 225 (1982). Thus, during cross-examination, a defendant may question an opposing witness regarding "particular facts having a logical tendency to show that the witness is biased against him or his cause, or that the witness is interested adversely to him in the outcome of the litigation." *State v. Hart*, 239 N.C. 709, 711, 80 S.E.2d 901, 902 (1954).

In the instant case, during recross-examination of Powers, defense counsel asked Powers whether she had informed the district attorney that she did not want to testify in the case. Powers answered in the affirmative, and defense counsel then asked Powers whether any "threats" were made against her in connection with her testimony. The State objected, arguing that the line of questioning was "opening new ground that is inappropriate for [defense counsel] to open." During the subsequent *voir dire* conference, defense counsel argued that Powers had indicated to him that "she was told what would happen to her if she didn't testify" and that "she had been threatened or forced to testify by being told what would happen if she didn't." Powers informed the trial court that "[t]he only thing it was is I said I do not want to testify, and I was told if I did not testify that I would be sent to jail." Powers informed the trial court that the assistant district attorney "told me that and a couple of other people told me that because this was the Superior Court, that I could get contempt of court or something like that." The State noted that it "did instruct her that an order to show cause was being prepared if she refused to appear," but that Powers "changed her mind, largely based on discussions with her mother and, if I'm not mistaken, her friend, not based on what I told her." When asked why she did not want to testify, Powers informed the trial court that she had "been through a lot," that she "didn't want to go through with it, relive it again[,]" and that she "figured that with all the other cases and the other charges that [defendant] had on him, it was enough." The trial court thereafter sustained the State's objection.

"The right to cross examine a witness to expose the witness' bias is not unlimited." *State v. Hatcher*, 136 N.C. App. 524, 526, 524 S.E.2d 815, 816 (2000). " '[W]hile it is axiomatic that the cross-examiner should be allowed wide latitude, the trial judge has discretion to ban unduly repetitious and argumentative questions, as well as inquiry into matters of tenuous relevance.' " *Id.* (quoting 1 Brandis & Broun on North Carolina Evidence § 170 (5th ed. 1998)) (alteration in original). "The trial judge may and should rule out immaterial, irrelevant, and incompetent matter." *State v. Stanfield*, 292 N.C. 357, 362, 233 S.E.2d 574, 578 (1977). On appeal, the trial court's decision to limit cross-examination is reviewed for abuse of discretion, and "rulings in controlling cross examination will not be disturbed unless it is shown that the verdict was improperly influenced." *Hatcher*, 136 N.C. App. at 526, 524 S.E.2d at 816.

In the instant case, we conclude that the trial court did not abuse its discretion in sustaining the State's objection. There is no indication that Powers was offered leniency or favorable treatment from the State in exchange for her testimony. The reasons for her unwillingness to testify and the possibility of her being held in contempt do not bear on her credibility or bias toward defendant, nor is whether she believed defendant had been tried "enough" relevant to any matter at issue in the trial. Furthermore, defendant has failed to demonstrate how the trial court's ruling regarding Powers' initial hesitation to testify improperly influenced the jury's verdict. Accordingly, we overrule defendant's second argument.

[3] Defendant next argues that the trial court erred by refusing to inquire further into an alleged communication with a juror. We disagree.

The record reflects that during jury deliberations, the trial court asked defense counsel whether there was "anything" he wanted "to put on the record[.]" Thereafter, defense counsel asked the trial court to "note for the record that during the recess the juror number seven was seated and I observed [the assistant district attorney] talking to the clerk." Defense counsel informed the trial court that he "thought" he heard the assistant district attorney "mention something about a statement." After the trial court noted that the juror sat in the jury box "the entire time by himself," defense counsel stated that "then there was conversation over there about three or four feet from them between [the assistant district attorney] and the clerk, and I thought I heard him mention something about a statement." The trial court noted that it was the same distance away from the clerk as the juror and "did not hear it." The trial court then concluded that "[w]ithout some showing that the juror heard it," it would not "make any inquiries." Nevertheless, the trial court did thereafter inquire as to whether defense counsel knew "what they were talking about[.]" Defense counsel responded that he believed the assistant district attorney mentioned "something about a statement." The trial court confirmed that defense counsel did not overhear "mention [of] anything about the facts of the case," and subsequently concluded that "[w]ithout more, it's denied."

When a trial court learns of alleged improper contact with a juror, "the trial court's inquiry into the substance and possible prejudicial impact of the contact is a vital measure for ensuring the impartiality of the juror." *State v. Burke*, 343 N.C. 129, 149, 469 S.E.2d 901, 910-11, *cert. denied*, 519 U.S. 1013, 136 L. Ed. 2d 409 (1996). The trial court is

given "the responsibility to conduct investigations to this effect, including examination of jurors when warranted[.]" *State v. Barnes*, 345 N.C. 184, 226, 481 S.E.2d 44, 67, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). "An inquiry into possible misconduct is generally required only where there are reports indicating that some prejudicial conduct has taken place." *Id.* However, the trial court retains sound discretion over its scope of the inquiry, and its decision is "given great weight on appeal." *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991). " 'The circumstances [surrounding an allegedly inappropriate communication] must be such as not merely to put suspicion on the verdict, because there was opportunity and a chance for misconduct, but that there was in fact misconduct. When there is merely matter of suspicion, it is purely a matter in the discretion of the presiding judge.' " *State v. Johnson*, 295 N.C. 227, 234-35, 244 S.E.2d 391, 396 (1978) (quoting *Lewis v. Fountain*, 168 N.C. 277, 279, 84 S.E. 278, 279 (1915)).

In the instant case, the alleged inappropriate contact occurred in the courtroom and in the presence of the trial court. The trial court noted that it could not hear what was discussed between the assistant district attorney and the clerk, and it was the same distance away as the juror. Defense counsel was not certain what was discussed, and could only state that he "thought" he overheard the assistant district attorney mention "something" about "a statement," which defense counsel "assume[d]" was related to the case. There is no indication that the alleged inappropriate communication had any influence on the respective juror or the verdict of the entire jury. In light of the foregoing, we conclude that the trial court did not abuse its discretion either in investigating or ruling upon the alleged inappropriate communication. Accordingly, defendant's third argument is overruled.

[4] Defendant next argues that the trial court erred by deferring its ruling on an evidentiary issue. Defendant asserts that the trial court chilled his right to present evidence by refusing to rule on the issue of whether the State could introduce evidence of his other bad acts. We disagree.

The record reflects that prior to trial, the State filed a motion requesting that it be allowed to introduce into evidence other bad acts involving Powers to which defendant had pled guilty on 29 October 2002. The acts occurred within two months following the incident giving rise to the instant case, and they included defendant's

alleged discharge of a weapon into a dwelling occupied by Powers and the alleged theft and subsequent burning of Powers' vehicle. In a pretrial hearing, the trial court determined that defendant had not been provided with a record of the relevant convictions until the date of the hearing. The trial court thereafter ruled that the State was prohibited from using the evidence during the instant case.

During trial, defendant's father, Frank Jacobs, Jr. ("Frank"), testified on defendant's behalf. Frank testified that he had seen defendant and Powers together on 5 April 2002 or 6 April 2002, while defendant was on bonded release for the instant charge. The State objected to Frank's testimony, arguing that defendant was "getting into a dangerous area" and that defendant's examination of Frank was entering "that temporal area" of defendant's relationship with Powers following the incident. The State asserted that, in light of the trial court's pretrial ruling, defendant was relying on "the idea that he w[ould] prevent [the State] from eliciting the real story of [defendant and Powers'] relationship after" the incident, namely, the bad acts defendant had pled guilty to prior to trial. During a *voir dire* hearing on the matter, the following exchange occurred between the trial court and defense counsel:

THE COURT: If you open that door, the D.A.'s going to come back with all of these convictions that he [pled] guilty to. I don't know that I'm going to allow it, but I've kept it out so far. But if you open that door, I don't know, then. I'm not going to tell you, but I think maybe you and your client ought to discuss that strategy. At this point I'm going to rule that immaterial. That confused the jury on the issues under 403.

DEFENSE COUNSEL: Your Honor, but what about the testimony of a witness about she taking her and [defendant]—they were together and they took her to get her license? How—I guess I need a ruling on that.

. . . .

THE COURT: Well, then you're going to argue that they were good and this, that and the other, and I think you're—if you open that door that they were

getting along after this incident, then I think there is a chance, not saying I'd allow it, but I'm saying there's a chance of rebuttal on behalf of the District Attorney that needs to be weighed before you do anything like that. I'm going to hold it out right now.

After ensuring that defendant had participated in the decision not to offer further evidence from Frank, the trial court reminded defendant that "I don't know what I'd do with that. I'm not telling you I'd let it in; I'm not telling you I'd keep the D.A. from doing it." Defense counsel thereafter made an offer of proof on *voir dire*, during which Frank testified that Powers visited defendant at Frank's residence less than a week after defendant was released on bond. Frank testified that during the visit, defendant and Powers "r[o]de off someplace" for a short period of time. Frank further testified that he saw Powers and defendant together again near the end of April, when Powers and defendant spoke in front of Frank's residence for "15-20 minutes." Following this testimony, the trial court stated that it would overrule the State's objection, would deny defendant's motion *in limine*, but would not rule on whether the State would be allowed to impeach Frank with the prior bad acts. Defendant refused the offer to elicit further testimony from Frank in the jury's presence.

"The decision whether to grant a motion *in limine* rests in the discretion of the trial court." *State v. Holman*, 353 N.C. 174, 184, 540 S.E.2d 18, 25 (2000), *cert. denied*, 534 U.S. 910, 151 L. Ed. 2d 181 (2001). In *Holman*, the defendant pled guilty to the first-degree murder of his estranged wife. During his sentencing proceeding, the defendant attempted to introduce evidence tending to show that, at the time he killed his wife, he was acting under a mental or emotional disturbance spawned by an indication that his wife was rekindling a relationship with her ex-husband. The defendant moved the trial court for a ruling that the introduction of the evidence would not open the door to the State to introduce evidence previously ruled irrelevant. The trial court deferred its ruling on the motion until it heard the defendant's questions and their context, stating that "[w]ell, I think that door—while it might get open—I don't think it automatically flies open . . . . Neither can I say that the door would not be opened, depending on what's asked. So, I mean, that's a matter they'll have to consider, I suppose." *Id.* On appeal, our Supreme Court noted that it had consistently permitted evidence to be introduced in rebuttal of a particular fact on cross-examination, even if the evidence

would be incompetent or irrelevant when initially offered. *Id.* (citing *State v. Bishop*, 346 N.C. 265, 389, 488 S.E.2d 769, 782 (1997)). The Court further noted that "[a]t the point when the trial court deferred its ruling in the present case, it did not have sufficient information to decide upon the motion knowledgeably." *Holman*, 353 N.C. at 184, 540 S.E.2d at 25. Accordingly, the Court held that "the trial court did not abuse its discretion by deferring its ruling on the motion until sufficient information was presented to allow the trial court to make a proper and informed decision." *Id.*

We conclude that the reasoning of *Holman* is applicable to the instant case. Following defendant's offer of proof, the trial court stated that it would deny the State's objection to Frank's testimony but could not ensure that it would not allow the State to cross-examine Frank with the bad acts. Defendant nevertheless refused to offer the testimony to the jury, stating that he was concerned he would "run the risk of 404(b) evidence" if the testimony was offered. The trial court reminded defendant that it had not ruled upon whether such evidence would be allowed during cross-examination and was "not going to cross bridges until I come to them because I don't know what anybody's going to do." In light of *Holman*, we conclude that the trial court did not abuse its discretion in its determination.

Defendant relies on *State v. Lamb*, 321 N.C. 633, 365 S.E.2d 600 (1988) to support his contention that the trial court's decision not to rule upon the motion *in limine* chilled defendant's right to present evidence. However, we conclude that defendant's reliance on *Lamb* is misplaced. In *Lamb*, the Court held that a defendant's right to testify could be "impermissibly chilled" if, in response to a motion *in limine* to prohibit cross-examination of impermissible evidence of other crimes, the trial court issues a "bald denial" and never provides the defendant with "any assurance that, should she testify, provided she did not open the door, she would be protected from impermissible evidence being used to impeach her." *Id.* at 649, 365 S.E.2d at 609. In the instant case, the trial court did not issue a "bald denial" of defendant's motion. Instead, it merely deferred its ruling on whether the State would be allowed to cross-examine Frank about defendant's bad acts following the incident. Defendant recognized "the risk" at trial, and decided that he did not "want to take that chance[.]" "Defendant's decision not to introduce the evidence in question was a purely tactical one based on the possibility that the questioning might open the door to undesired cross-examination. Defendant's choice of tactics in this instance did not implicate any of his rights." *Holman*,

353 N.C. at 185, 540 S.E.2d at 26. Accordingly, we overrule defendant's fourth argument.

**[5]** Defendant next argues that the trial court erred by sentencing him in the aggravated range. Defendant asserts that the trial court was prohibited from sentencing him in the aggravated range without first submitting an aggravating factor to the jury for proof beyond a reasonable doubt. We agree.

In *State v. Allen*, 359 N.C. 425, —— S.E.2d —— (Filed 1 July 2005) (No. 485PA04), our Supreme Court recently examined the constitutionality of North Carolina's structured sentencing scheme in light of the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004). The Court noted initially that its holding would "apply to cases 'in which the defendants have not been indicted as of the certification date of this opinion and to cases that are now pending on direct review or are not yet final.' " 359 N.C. at 427, —— S.E.2d at —— (quoting *State v. Lucas*, 353 N.C. 568, 598, 548 S.E.2d 712, 732 (2001)). As defendant's instant appeal was pending on direct review when *Allen* and *Blakely* were decided, we conclude that their reasoning and holdings are applicable to the instant case.

After reviewing the applicable case law, the Court in *Allen* concluded that, when "[a]pplied to North Carolina's structured sentencing scheme, the rule of *Apprendi* and *Blakely* is: Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed presumptive range must be submitted to a jury and proved beyond a reasonable doubt." 359 N.C. at 437, —— S.E.2d at —— (citing *Blakely*, 542 U.S. at ——, 159 L. Ed. 2d at 413-14; *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455; N.C. Gen. Stat. §§ 15A-1340.13, 15A-1340.14, 15A-1340.16, 15A-1340.17). In the instant case, following defendant's conviction for second-degree kidnapping, the trial court found as an aggravating factor that defendant committed the offense to disrupt and hinder the lawful exercise of a governmental function or the enforcement of laws. The trial court found this factor unilaterally, thereby aggravating defendant's sentence without submitting the issue to the jury for proof beyond a reasonable doubt. In light of our Supreme Court's decision in *Allen*, we conclude that the trial court committed reversible error.[1] Therefore, we remand the case for resentencing.

---

1. Defendant also asserts that the trial court was prohibited from sentencing him in the aggravated range because the State failed to allege the aggravating factor in

**[6]** Defendant next argues that the trial court erred by imposing attorney's fees upon him. Defendant asserts that he was not provided with sufficient notice of or an opportunity to be heard concerning the fees of his court-appointed attorney. We agree.

N.C. Gen. Stat. § 7A-455 (2003) provides that the trial court may enter a civil judgment against a convicted indigent defendant for the amount of fees incurred by the defendant's court-appointed attorney. In *State v. Crews*, 284 N.C. 427, 201 S.E.2d 840 (1974), our Supreme Court noted that there was no evidence in the record supporting or negating the defendant's contention that a judgment imposing attorney's fees was entered without notice or opportunity for him to be heard. Accordingly, the Court vacated the judgment "without prejudice to the State's right to apply for a judgment in accordance with G.S. 7A-455 after due notice to defendant and a hearing[.]" *Id.* at 442, 201 S.E.2d at 849-50. Similarly, in *State v. Stafford*, 45 N.C. App. 297, 300, 262 S.E.2d 695, 697 (1980), this Court vacated a civil judgment imposing attorney's fees on the defendant where, notwithstanding a signed affidavit of indigency, there was "no indication [in the record] that [the] defendant received any opportunity to be heard on the matter" of attorney's fees.

In the instant case, following the imposition of defendant's sentence, the trial court inquired as to whether defendant's counsel was appointed. Defense counsel replied that he was court-appointed, but he informed the trial court that he had not yet calculated his hours of work related to defendant's representation. After the trial court instructed defense counsel to calculate his hours and submit them to the court, the following exchange occurred between defendant and the trial court:

THE COURT: Well, now, let me say to you, Mr. Jacobs, I'm going to give you notice of this now, he's going to submit a bill, an hourly bill. I don't know how much that hourly bill is going to total up, how many hours he's

---

defendant's indictment. However, our Supreme Court expressly rejected the same assertion by the defendant in *Allen*, 359 N.C. at 437-38, —— S.E.2d at —— (overruling language in *Lucas* "requiring sentencing factors which might lead to a sentencing enhancement to be alleged in an indictment[,]" finding no error in the State's failure to include aggravating factors in the defendant's indictment, and noting that in *State v. Hunt*, "[T]his Court concluded that 'the Fifth Amendment would not require aggravators, even if they were fundamental equivalents of elements of an offense, to be pled in a state-court indictment.'" (quoting *State v. Hunt*, 357 N.C. 257, 272, 582 S.E.2d 593, 603, *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702 (2003)). Accordingly, defendant's assertion in the instant case is overruled as well.

got. I know he's got two days, more than two days work here in the courtroom. But whatever, it's going to be at a rate of $65 an hour that the State allots. I'll use the multiple $65 times the hours that he submits that I find to be reasonable, and I'm certain that he will be honest in that regard. Whatever that is I'm going to order—enter an order that the State of North Carolina pay him the amount for representing you. I also will be signing a judgment, possibly, to be used against you that will require you some day in the future, maybe, to have to reimburse the State that amount of money. You've heard all this before, haven't you?

DEFENDANT: Yes, sir.

THE COURT: That's called the notice. You got the notice now. You know what I'm talking about. Now you've got your right to say anything reasonable about my award of attorney's fees. You got any problem with it?

DEFENDANT: No, sir.

THE COURT: Sir?

DEFENDANT: No, sir.

THE COURT: Well, now you've been told, and in open court you've been advised of that.

This exchange clearly demonstrates that defendant was given notice of the trial court's intention to impose attorney's fees upon him. However, while the transcript reveals that attorney's fees were discussed following defendant's conviction, there is no indication in the record that defendant was notified of and given an opportunity to be heard regarding the appointed attorney's total hours or the total amount of fees imposed. Therefore, in light of the foregoing, we vacate the trial court's imposition of attorney's fees in this matter. On remand, the State may apply for a judgment in accordance with N.C. Gen. Stat. § 7A-455, provided that defendant is given notice and an opportunity to be heard regarding the total amount of hours and fees claimed by the court-appointed attorney.

In light of the foregoing conclusions, we hold that defendant received a trial free of prejudicial error, but we vacate the trial

court's imposition of attorney's fees, and we remand the case for resentencing.

No error in part; vacated in part; remanded for resentencing.

Judges CALABRIA and GEER concur.