IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA20-237

Filed: 3 November 2020

Carteret County, No. 18CRS54329

STATE OF NORTH CAROLINA

v.

CHRISTINA ANN BOWMAN

Appeal by Defendant from judgment entered 24 September 2019 by Judge Richard Kent Harrell in Carteret County Superior Court. Heard in the Court of Appeals 6 October 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Sarah N. Cibik, for the State-Appellee.*

*Richard J. Costanza for Defendant-Appellant.*

COLLINS, Judge.

Defendant Christina Ann Bowman appeals from judgment entered upon a jury verdict of guilty of first-degree burglary. Defendant argues that (1) she was denied effective assistance of counsel because her trial counsel conceded her guilt to the lesser-included offense of misdemeanor breaking or entering without her consent, (2) the trial court erred by failing to intervene ex mero motu to address the prosecutor's attack on the credibility of Defendant's expert witness during closing argument, and (3) the trial court erred by denying her the opportunity to be heard

prior to the entry of a civil judgment for attorneys' fees. We discern no error in defense counsel's remarks and no reversible error in the trial court's failure to intervene ex mero motu to address the prosecution's improper remarks. We vacate the civil judgment for attorneys' fees and remand the matter to allow Defendant to waive further proceedings or to request an opportunity to be heard.

## I. Procedural History

On 11 March 2019, Defendant was indicted on one count of first-degree burglary. Defendant was tried before a jury in Carteret County Superior Court from 23 to 24 September 2019. The jury found Defendant guilty of first-degree burglary and the trial court sentenced Defendant to an active term of 59 to 83 months' imprisonment on 24 September 2019. The trial court then entered a civil judgment against Defendant for attorneys' fees and other expenses on 25 September 2019. On 26 September 2019, Defendant gave written notice of appeal from her conviction for first-degree burglary.

## II. Factual Background

The evidence at trial tended to show the following: In December 2018, Ginger and Milton Boyd resided in Morehead City with their two children. The home was situated at the back of a two-acre lot and is accessible by a dirt road. It was surrounded by homes owned by other members of the Boyd family.

At approximately 5:30 to 6:00 a.m. on 10 December 2018, Ginger Boyd saw a flash from a flashlight inside her bathroom. When she went to investigate, she encountered Defendant standing in the living room. Defendant initially claimed that she was an emergency medical services responder there to assist a dead person on the couch. Defendant had never been in the Boyd home and was not invited. At that point, Mrs. Boyd grabbed Defendant's arms, pushed her against the wall, and screamed for her husband, Milton Boyd. Mrs. Boyd believed that Defendant was under the influence of an impairing substance.

Milton Boyd had never seen Defendant before. When he came into the living room in response to Mrs. Boyd's call, he saw that she had restrained Defendant to prevent her from leaving. Mr. Boyd proceeded to take hold of Defendant. Defendant pointed to Mrs. Boyd's purse, claimed it was hers, and said she wanted to leave. Mr. Boyd believed that Defendant was coherent and was not intoxicated with alcohol, but could not say whether she was under the influence of any drugs.

The Boyds' minor son, who was sleeping on the couch, woke up to his mother yelling at Defendant and indicated that Defendant was making up stories.

The Boyds' daughter, Jessica, was awakened by the screaming, and when she came downstairs, she recognized Defendant because they had been roommates eight years prior. Defendant began to insist that she was there to assist different members

of the Boyd family. Jessica called 911. She also believed Defendant was under the influence.

While waiting for officers to respond, Mrs. Boyd called her brother-in-law to restrain Defendant while she and her husband got dressed. During that time Defendant struggled to leave and claimed that the Boyds were hurting her arm. Defendant alternately explained that someone had chased her or someone had asked her to come to the house.

Carteret County Sheriff's Deputies Christopher Kuzynski and Jordan Byrd responded to the 911 call. When they arrived, the two arrested Defendant. When Byrd asked Defendant why she was in the Boyd home, she initially responded that she was attacked by two others who chased her, shot at her, and jumped her. Upon further questioning, Defendant told Byrd that she had gone inside the Boyd home to check on an injured person.

Kuzynski believed that Defendant appeared "a little lethargic" and thought she was under the influence of a substance other than alcohol. Byrd recognized Defendant from a previous arrest for breaking or entering. After that arrest, she was involuntarily committed because she had told police that voices in her head led her to enter the home. In contrast to the previous arrest, Byrd believed that Defendant was more coherent on the night of 10 December, though she still claimed that voices were guiding her.

After the deputies arrived and took Defendant into custody, they returned to the Boyd home to collect Defendant's belongings. Defendant's wallet was found in Mrs. Boyd's purse alongside loan documents, wireless headphones, and other items belonging to the Boyds which had been stored in vehicles outside the Boyd home. The purse had been moved from the hook where Mrs. Boyd kept it to the kitchen table.

At trial, Defendant called Dr. Amy James as an expert in forensic psychology. She testified that she interviewed Defendant and reviewed court records, police records, involuntary commitment records, and medical records. Based upon this examination, Dr. James diagnosed Defendant with post-traumatic stress disorder, severe alcohol use disorder, severe amphetamine use disorder, and a personality disorder. She testified that Defendant admitted to using methamphetamine daily; use of the drug can result in a methamphetamine-associated psychosis which presents with delusions, paranoia, and hallucinations; and Defendant's symptoms were congruent with this condition.

The jury found Defendant guilty of first-degree burglary. The trial court entered judgment upon the jury's verdict, sentencing Defendant to 59 to 83 months' imprisonment, and entered a civil judgment against Defendant for attorneys' fees and other expenses. Defendant gave written notice of appeal from the judgment entered upon her conviction for first-degree burglary.

### III. Appellate Jurisdiction

Defendant's written notice of appeal was sufficient to confer jurisdiction on this Court to review the criminal judgment. *See* N.C. Gen. Stat. § 7A-27(b)(1); N.C. R. App. P. 4(a)(2). However, Defendant's written notice of appeal was limited to the criminal judgment, and is therefore insufficient to confer jurisdiction on this Court to review the civil judgment for attorneys' fees. *See* N.C. R. App. P. 3(a). This issue is subject to dismissal.

Contemporaneously with his opening brief, Defendant filed a petition for writ of certiorari, acknowledging the deficiency in his notice of appeal and asking this Court issue a writ of certiorari to review the civil judgment for attorneys' fees. We exercise our discretion under N.C. R. App. P. 21(a) and issue a writ of certiorari to review the issues pertaining to the civil judgment for attorneys' fees. *E.g. State v. Friend*, 257 N.C. App. 516, 519, 809 S.E.2d 902, 905 (2018) (issuing a writ of certiorari to review a civil judgment for attorneys' fees where the defendant's arguments were meritorious).

### IV. Discussion

*A. Ineffective Assistance of Counsel*

Defendant first argues that her trial counsel implicitly conceded that she was guilty of misdemeanor breaking or entering, denying her right to effective assistance

of counsel. We review whether a defendant was denied effective assistance of counsel de novo. *State v. Foreman*, 842 S.E.2d 184, 187 (N.C. Ct. App. 2020).

A defendant claiming ineffective assistance of counsel must ordinarily show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Defense counsel's admission of the defendant's guilt of a charged offense to the jury without the defendant's consent, however, is per se ineffective assistance of counsel. *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507-08 (1985).

"Although an overt admission of the defendant's guilt by counsel is the clearest type of *Harbison* error, it is not the exclusive manner in which a per se violation of the defendant's right to effective assistance of counsel can occur." *State v. McAllister*, No. 221A19, 2020 WL 5742615, at *13 (N.C. Sept. 25, 2020). *Harbison* error also occurs where "defense counsel impliedly concedes his client's guilt without prior authorization." *Id.* at *12.

"Our Supreme Court has 'previously declined to set out what constitutes an acceptable consent by a defendant in this context.'" *State v. Perry*, 254 N.C. App. 202, 212, 802 S.E.2d 566, 574 (2017) (quoting *State v. McDowell*, 329 N.C. 363, 387, 407 S.E.2d 200, 213 (1991)). "[A]n on-the-record exchange between the trial court and the defendant is the preferred method of determining whether the defendant knowingly and voluntarily consented to an admission of guilt," but our courts have "declined to

define such a colloquy as the sole measurement of consent or to set forth strict criteria for an acceptable colloquy." *State v. Thompson*, 359 N.C. 77, 120, 604 S.E.2d 850, 879 (2004). A defendant may consent to his counsel's concession of guilt at trial without the same formalities that apply to a defendant's guilty plea. *See State v. Maready*, 205 N.C. App. 1, 7, 695 S.E.2d 771, 776 (2010) (distinguishing statutory requirements for a defendant's entry of a guilty plea). "For us to conclude that a defendant permitted his counsel to concede his guilt to a lesser-included crime, the facts must show, at a minimum, that defendant knew his counsel were going to make such a concession." *State v. Matthews*, 358 N.C. 102, 109, 591 S.E.2d 535, 540 (2004)*; see also State v. Thomas*, 327 N.C. 630, 631, 397 S.E.2d 79, 80 (1990) (remanding case to superior court for an evidentiary hearing to determine whether defendant knowingly consented to trial counsel's concessions of defendant's guilt to the jury).

Defendant was indicted for first-degree burglary under N.C. Gen. Stat. § 14-51. "Misdemeanor breaking or entering is a lesser-included offense of first-degree burglary." *State v. Mangum,* 158 N.C. App. 187, 196, 580 S.E.2d 750, 756 (2003). Conviction for misdemeanor breaking or entering therefore "requires only proof of wrongful breaking or entry into any building." *State v. O'Neal,* 77 N.C. App. 600, 606, 335 S.E.2d 920, 924 (1985); *see also* N.C. Gen. Stat. § 14-54(b) (2019) ("Any person who wrongfully breaks or enters any building is guilty of a Class 1 misdemeanor."). The trial court accordingly instructed the jury that if it did not find Defendant guilty

of first-degree burglary, it must consider whether she was guilty of misdemeanor breaking or entering.

In his opening statement, counsel reminded the jury that it was the State's burden to prove that Defendant "had the specific intent to commit a larceny or a felony when she entered the Boyds' home on that morning." Counsel contended that "[t]he evidence shows that she was confused about why she was there[,]" and asked the jury "whether a person in a normal mental state would use [the explanation provided by Defendant] for their presence."[1]

In closing, defense counsel argued that the State failed to show Defendant had the requisite intent to support a first-degree burglary conviction. Counsel conceded on multiple occasions that Defendant had entered the Boyd home and reminded the jury of the State's burden to prove Defendant's intent "when she entered the Boyds' home that morning." He argued that "she was confused about why she was there[,]" and contended the evidence showed that Defendant's actions were "not the actions of a coherent burglar . . . ." Counsel asked the jury, "Can you really determine beyond a reasonable doubt that [Defendant] entered the Boyds' home to steal?" In concluding, counsel asked the jury to find Defendant "not guilty of first-degree burglary."

---

[1] The trial court ruled that this and several other remarks in counsel's opening statement were impermissibly argumentative, but did not instruct the jury to disregard the remarks.

Even presuming, without deciding, that counsel impliedly admitted Defendant's guilt to misdemeanor breaking or entering, he did so with Defendant's consent. Prior to defense counsel's opening statement, the trial court asked whether there were "[a]ny *Harbison* issues that we need to deal with?" Defense counsel responded that "we'll be admitting to everything but intent." At that point, the trial court addressed Defendant directly:

> THE COURT: . . . Ms. Bowman, you've heard [counsel] indicate that the issue that they intend to make is intent; that they'll be admitting the other elements of the offense. Do you understand that?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: All right. Do you agree with that?
>
> DEFENDANT: Yes, sir.

It is clear that "defendant knew [her] counsel [was] going to make such a concession." *Matthews*, 358 N.C. at 109, 591 S.E.2d at 540. The trial court's colloquy with Defendant demonstrated that Defendant knew her counsel planned to admit to all the elements of first-degree burglary except intent, understood, and agreed with this strategy.

Our Supreme Court held that a similar colloquy established that the defendant had consented to his counsel's concessions. *See Thompson*, 359 N.C. at 118, 604 S.E.2d at 878-79. In *Thompson*, defense counsel informed the trial court on the record and in the defendant's presence that he intended to "acknowledg[e] responsibility in these cases." *Id.* The trial court then directly addressed the defendant and confirmed

that he agreed with the strategy of making the admissions. *Id.* at 118-19; 604 S.E.2d at 878-79. Here, as in *Thompson*, Defendant acknowledged that she understood and agreed to counsel's strategy on the record. Defendant has therefore failed to demonstrate per se ineffective assistance of counsel under *Harbison*.[2]

## B. Prosecution's Closing Remarks

Defendant also argues that the trial court erred by failing to intervene ex mero motu when the prosecutor attacked the credibility of Defendant's forensic psychology expert during her closing argument.

"The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection." *State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). But "when defense counsel fails to object to the prosecutor's improper argument and the trial court fails to intervene, the standard of review requires a two-step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial." *State v. Huey*, 370 N.C. 174, 179, 804 S.E.2d 464, 469 (2017). Only

---

[2] Ordinarily, when we do not find per se ineffective assistance of counsel under *Harbison*, "the issue concerning ineffective assistance of counsel should be examined pursuant to the normal ineffectiveness standard set forth in *Strickland v. Washington* . . . ." *State v. McDowell*, 329 N.C. 363, 387, 407 S.E.2d 200, 213 (1991). We do not reach this analysis, however, because Defendant argued only that her counsel's conduct amounted to per se ineffective assistance.

where we find "both an improper argument and prejudice will this Court conclude that the error merits appropriate relief." *Id.*

In a criminal trial, counsel's remarks are improper if he "become[s] abusive, inject[s] his personal experiences, express[es] his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make[s] arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." N.C. Gen. Stat. § 15A-1230 (2019). "Within these statutory confines, we have long recognized that prosecutors are given wide latitude in the scope of their argument and may argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom." *Huey*, 370 N.C. at 180, 804 S.E.2d at 469 (quotation marks omitted).

Our courts have frequently addressed the propriety of arguments attacking the credibility of expert witnesses. "[I]t is proper for an attorney to point out potential bias resulting from payment a witness received or would receive for his services," but "it is improper to argue that an expert should not be believed because he would give untruthful or inaccurate testimony in exchange for pay." *Id.* at 183, 804 S.E.2d at 471-72; *accord State v. Rogers*, 355 N.C. 420, 462-63, 562 S.E.2d 859, 885 (2002). Counsel must not go so far as "to insinuate that the witness would perjure himself or herself for pay." *Rogers*, 355 N.C. at 463, 562 S.E.2d at 885.

"For an appellate court to order a new trial, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Huey*, 370 N.C. at 180, 804 S.E.2d at 470 (quotation marks and citations omitted). "In determining whether a prosecutor's statements reached this level of gross impropriety, we consider the statements 'in context and in light of the overall factual circumstances to which they refer.'" *Id.* (quoting *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995)). Where the context shows "overwhelming evidence against a defendant, we have not found statements that are improper to amount to prejudice and reversible error." *Id.* at 181, 804 S.E.2d at 470.

At trial, Dr. James testified for the defense as an expert in forensic psychology. On cross examination, Dr. James acknowledged that she was paid for her time by the State, on behalf of Defendant. Dr. James indicated that she is paid flat rates for time traveling, time spent in court, and time actually testifying. With these facts in evidence, the prosecutor was permitted "to point out potential bias resulting from payment a witness received or would receive for his services." *Id.* at 183, 804 S.E.2d at 471.

In her closing argument, the prosecutor addressed the issue of intent and attacked the credibility of Dr. James's testimony. The prosecutor said that "psychosis is quite convenient as an excuse" for Defendant' actions. She argued that Defendant

"had Dr. James come and testify . . . with the end in mind"; that she was "paid by the defense, for the defense, to give good stuff for the defense"; and that "[y]ou get what you put out. What you put in, you get out." After questioning the utility of Dr. James's diagnoses of Defendant, the prosecutor remarked to the jury, "So I ask you to take that for what it is. At the end of the day, hired by the defense, for the defense, to say good things for the defense . . . ." Defendant failed to object to any of these remarks.

These remarks were improper because they went beyond permissibly arguing that an expert witness was potentially biased. *Id.* The prosecution impermissibly suggested to the jury that Defendant's psychological expert was paid to fabricate an excuse for Defendant's conduct and acts, regardless of the truth. By arguing that psychosis was an "excuse," Dr. James testified with an end in mind, Dr. James was paid "to give good stuff for the defense," and Dr. James was hired "to say good things for the defense," the prosecutor inappropriately suggested that Dr. James "should not be believed because [s]he would give untruthful or inaccurate testimony in exchange for pay." *Id.* at 183, 804 S.E.2d 472.

The prosecution's remarks impugning the defense expert's credibility in this case are substantively equivalent to those the Court held improper in *Huey*. There, the prosecution stated that (1) the defendant was the psychiatric expert's "client," (2) the expert "works for the defendant" and was "not an impartial mental-health

expert," (3) the expert "has a specific purpose, and he's paid for it," (4) the expert was a "$6,000 excuse man," and (5) the expert had done "exactly what he was paid to do." *Id.* at 178, 804 S.E.2d at 468. As discussed above, the prosecution's remarks in this case had the same tenor, and were therefore improper.

Still, while the remarks were clearly improper, in the absence of any objection thereto by Defendant, they were not so grossly improper as to impede the defendant's right to a fair trial. *Id.* at 179, 804 S.E.2d at 469. Similar remarks have been held not to amount to prejudicial, and therefore reversible, error. *See, e.g., State v. Campbell,* 359 N.C. 644, 677, 617 S.E.2d 1, 22 (2005) (prosecutor's characterization of the defense expert as a "witness that the defendant could buy" was not grossly improper); *Rogers,* 355 N.C. at 460-61, 562 S.E.2d at 884-85 (prosecutor's remarks that "it's a crying shame when education is corrupted for filthy lucre, it's a crying shame when people who've got the education abuse it" and "saying [something] doesn't make it so cause you can pay somebody to say anything" were not so grossly improper as to require the trial court to intervene ex mero motu); *State v. Murillo,* 349 N.C. 573, 604-05, 509 S.E.2d 752, 770-71 (1998) (prosecutor's remarks that "[i]t is a sad state of our legal system, that when you need someone to say something, you can find them. You can pay them enough and they'll say it," even if improper, were not prejudicial).

Moreover, we cannot conclude that the prosecution's remarks were so prejudicial as to merit a new trial considering the substantial amount of evidence tending to show that Defendant had the requisite intent for first-degree burglary. Numerous witnesses for the State testified that Defendant had entered the Boyd home on the night in question. The home was located on a secluded private property, which would have required Defendant to travel down a curved dirt road. Defendant had taken items belonging to the Boyds from cars on the Boyd property and put them inside Ginger Boyd's purse, along with Defendant's own wallet. When Mrs. Boyd found Defendant in the house, Defendant was in the living room and had a flashlight. The jury also heard Rule 404(b) evidence about Defendant's previous break in, which the court instructed the jury was "solely for the purpose of showing the identity of the person who committed the crime charged in this case, . . . that the defendant had the intent, . . . or that there existed in the mind of the defendant a plan, scheme, system, or design . . . ." Because the record reveals significant evidence on the question of Defendant's intent, the prosecutor's improper remarks concerning Defendant's expert were not sufficiently prejudicial to require reversal. *See Huey*, 370 N.C. at 181, 804 S.E.2d at 470.

## C. Civil Judgment on Attorneys' Fees

Finally, Defendant challenges the trial court's entry of a civil judgment on attorneys' fees outside of her presence.

In certain circumstances, a trial court may enter a judgment requiring an indigent defendant to pay for a portion of the cost of legal services provided by appointed counsel. *See* N.C. Gen. Stat. § 7A-455 (2019).

> [B]efore entering money judgments against indigent defendants for fees imposed by their court-appointed counsel under N.C. Gen. Stat. § 7A-455, trial courts should ask defendants—personally, not through counsel— whether they wish to be heard on the issue. Absent a colloquy directly with the defendant on this issue, the requirements of notice and opportunity to be heard will be satisfied only if there is other evidence in the record demonstrating that the defendant received notice, was aware of the opportunity to be heard on the issue, and chose not to be heard.

*Friend*, 257 N.C. App. at 523, 809 S.E.2d at 907.

The trial court informed Defendant that it intended to impose a civil judgment for attorneys' fees, that appointed counsel's fee would be $75 per hour, and that it would enter the civil judgment against her once counsel had submitted an affidavit setting forth his time in the case. When asked, Defendant stated that she had no objection to entry of the civil judgment. But because Defendant did not know either the number of hours her appointed counsel planned to submit or the consequent amount she would owe, Defendant was deprived of a meaningful opportunity to be heard before the judgment was entered.

In light of these facts, the State has informed the Court in its brief that it "does not oppose Defendant's request that this matter be remanded to the trial court

exclusively on the issue of the civil judgment for attorney's fees." We agree that vacating the civil judgment and remanding to the trial court for a waiver by Defendant or a hearing on the issue of attorneys' fees is the appropriate remedy. *See State v. Jacobs*, 172 N.C. App. 220, 236, 616 S.E.2d 306, 317 (2005) (vacating and remanding a civil judgment for attorneys' fees where there was "no indication in the record that defendant was notified of and given an opportunity to be heard regarding the appointed attorney's total hours or the total amount of fees imposed").

## V. Conclusion

Even presuming that trial counsel conceded Defendant's guilt to a charged offense, we find no *Harbison* error because counsel acted with Defendant's consent. Though the prosecutor's remarks attacking the credibility of Defendant's expert witness were improper, they were not so grossly improper as to impede Defendant's right to a fair trial. We vacate the civil judgment for attorneys' fees and remand to the trial court to allow Defendant to either waive further proceedings or be given an opportunity to be heard on the matter.

NO ERROR IN PART; VACATED AND REMANDED IN PART.

Judges BRYANT and TYSON concur.