IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-518

Filed: 16 June 2020

Wake County, Nos. 17 CRS 221499, 221501

STATE OF NORTH CAROLINA

v.

QUINTON DANTE ENGLISH

Appeal by Defendant from judgments entered 21 December 2018 by Judge Rebecca W. Holt in Wake County Superior Court. Heard in the Court of Appeals 26 May 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Ellen A. Newby, for the State-Appellee.*

*Leslie Rawls for Defendant-Appellant.*

COLLINS, Judge.

Defendant Quinton Dante English appeals judgments entered upon jury verdicts of guilty of felony first-degree kidnapping, misdemeanor simple assault, misdemeanor unauthorized use of a vehicle, and two counts of misdemeanor assault with a deadly weapon. On appeal, Defendant argues that the trial court erred by denying his motion to dismiss the charge of first-degree kidnapping and one of the counts of assault with a deadly weapon, on grounds that the State failed to present sufficient evidence of the offenses. We discern no error by the trial court.

## I. Procedural History

Defendant was indicted on 9 January 2018 for first-degree kidnapping and assault by strangulation. On 11 January 2018, Defendant was indicted for larceny of a motor vehicle, assault with a deadly weapon inflicting serious injury, and two counts of assault with a deadly weapon with intent to kill.

A jury trial began on 17 December 2018. The jury found Defendant guilty of felony first-degree kidnapping, misdemeanor simple assault as a lesser-included offense of assault by strangulation, misdemeanor unauthorized use of a motor vehicle as a lesser-included offense of larceny of a motor vehicle, and two counts of misdemeanor assault with a deadly weapon as a lesser-included offense of assault with a deadly weapon with intent to kill. The jury found Defendant not guilty of assault with a deadly weapon inflicting serious injury.

The parties stipulated that Defendant was a prior record level III for sentencing of the misdemeanor convictions and a prior record level IV for sentencing of the felony conviction. The trial court consolidated the convictions of felony first-degree kidnapping, misdemeanor simple assault, and misdemeanor unauthorized use of a motor vehicle into one judgment, sentencing Defendant to 110 to 144 months' imprisonment. The trial court consolidated the convictions of two counts of misdemeanor assault with a deadly weapon into another judgment, sentencing

Defendant to two consecutive sentences of 150 days. The judgments were entered on 21 December 2018.

Defendant gave oral notice of appeal in open court.

## II. Factual Background

The State's evidence at trial tended to show the following: Defendant and Evelyn Gonzalez were in a relationship for approximately two years, which involved frequent arguments and Defendant's physical abuse of Gonzalez. Although Gonzalez did not report several incidents of physical abuse, she called the police on one occasion when Defendant hit her, pulled her hair, and choked her.

The two argued during the weekend of 4 and 5 November 2017. After Gonzalez blocked Defendant's phone numbers on 5 November 2017, Defendant sent Gonzalez private messages on Facebook. Gonzalez replied to a few of the messages that day, but she stopped responding while she was at work. When Gonzalez left work at 5:00 p.m., she walked to her car, which she had left unlocked in the parking lot near the back of the building. Just as Gonzalez entered the car, Defendant sat up in the back seat. Defendant testified that there had been previous times he had waited for Gonzalez in either the driver's or passenger's seat of her car to pick her up from work, but on this day, he was lying down in the back seat waiting for her. Gonzalez asked Defendant what he was doing in her car, and they began to argue. Defendant was holding a red knife.

Defendant took Gonzalez's phone from her and began looking at her messages. Gonzalez hesitated to give it to him but did not refuse because she was afraid Defendant would get angry like he had before, when Defendant "would start screaming, getting abusive, verbal and physical" if Gonzalez did not give him access to her phone. Defendant became angry, called Gonzalez a liar, and said that she did not love him. Gonzalez testified, "I knew he was about to do what he always does when he got mad," which is to "[p]ut his hands on me" and "[m]ake me stay in the car until he is not mad anymore."

Defendant told Gonzalez to drive the car. When she refused, Defendant got angry, put his arm around her neck, and "started choking" her. Gonzalez had difficulty breathing. Defendant brandished the knife, held it to her right side, and applied force to her neck until she started driving the car. Gonzalez was afraid.

In order to try to get out of the car, Gonzalez pulled quickly into a gas station up the street from where her car had been parked. A witness estimated that the car was travelling about 30 or 40 miles an hour when the driver abruptly stopped in front of a gas pump, and the tires screeched. Gonzalez told Defendant that she wanted to go inside the convenience store to get a drink, but Defendant told her that she could not get out of the car, that they were not stopping, and to keep driving. Gonzalez noticed people nearby, so she opened the door and screamed for help. Defendant leaned over the seat, started to choke her, and punched her. Gonzalez testified, "It

was a lot, and he was like he had his hand around my neck and he was punching like on the top of my head and I started to get lightheaded." While Gonzalez tried to get out of the car, Defendant tried to close the door, told Gonzalez to put her foot on the pedal, and screamed at her, "Bitch, drive."

Jacob Capps and Jackson Capps, two brothers whom Gonzalez had never seen before, pulled up on motorcycles to a gas pump at the same station, noticed a car pulling into the gas station at a speed of approximately 30 to 40 miles per hour, and heard the "horrific" sounds of a female screaming. Jacob testified that Defendant was in the back seat of the car, "over the center console with his arm around [Gonzalez's] neck. She was crying. It looked like she had been beaten." Gonzalez's neck was red, her face was swollen and bruised, and she was "screaming, crying, pleading for help." The Capps brothers approached the car to try to help Gonzalez. Jacob started hitting Defendant, and Gonzalez was able to slide underneath Defendant, get out of the car, and run into the gas station. The convenience store clerk called 911 and instructed Gonzalez to go in the freezer until the doors to the station were locked.

Jacob entered the back seat on the driver's side of the car and pinned Defendant against the roof. Defendant punched Jacob and tried to poke him in the eyes. Defendant brandished the knife at Jacob. Jacob and Defendant came out of the car and continued to wrestle, both throwing more punches. Jackson told Jacob that Defendant had a knife. Jacob tried to subdue Defendant while Defendant was on top

of him. Jackson kicked Defendant in the face a few times. When Defendant asked Jacob to let him go, Jacob told Defendant he would let him go after Defendant dropped the knife. Jackson wrapped his arms around Defendant's legs and pushed his foot up against Defendant's ribs to help subdue him. After approximately one minute, Defendant dropped the knife, Jackson picked it up, and Jacob let Defendant get up.

When the Capps brothers started to walk away from Defendant, Defendant got in the car, put it in drive, turned it around with tires squealing, and "floored it" in their direction. He "stomped" the gas "at high RPMs" and drove about 15 to 20 miles per hour toward them. Jackson stepped behind the gas pump to shield himself. Jacob jumped up on the hood of the car to avoid being pinned against the concrete wall of the gas station. When Defendant crashed the car into the wall of the gas station, Jacob rolled off the hood onto the ground. Defendant backed the car up and sped away.

## III. Discussion

Defendant argues that the trial court erred by denying his motion to dismiss for insufficient evidence the charges of first-degree kidnapping and one count of assault with a deadly weapon.

This Court reviews a trial court's denial of a motion to dismiss for insufficient evidence de novo. *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). Denial of a motion to dismiss is proper if there is substantial evidence of each

essential element of the offense and that the defendant was the perpetrator. *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted). When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State. *Fritsch*, 351 N.C. at 378-79, 526 S.E.2d at 455.

## A. First-degree kidnapping

Defendant's sole argument on appeal regarding the kidnapping offense is that the State failed to provide substantial evidence that Defendant's purpose was to terrorize Gonzalez.

Kidnapping is defined by statute as follows:

> (a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:
> . . . . .
> (3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person . . .

N.C. Gen. Stat. § 14-39(a)(3) (2018). The offense is first-degree kidnapping if the person kidnapped was not released by the defendant in a safe place. *State v. Moore*, 315 N.C. 738, 742, 340 S.E.2d 401, 404 (1986) (citing N.C. Gen. Stat. § 14-39)). "Since

kidnapping is a specific intent crime, the State must prove that the defendant unlawfully confined, restrained, or removed the person for one of the eight purposes set out in the statute." *Id.* at 743, 340 S.E.2d at 404. For purposes of this statute, "[i]ntent, or the absence of it, may be inferred from the circumstances surrounding the event and must be determined by the jury." *State v. White*, 307 N.C. 42, 48, 296 S.E.2d 267, 271 (1982) (citations omitted).

In this case, the State indicted Defendant on the charge of first-degree kidnapping, alleging that Defendant unlawfully confined and restrained Gonzalez for the purpose of terrorizing her. Terrorizing is "more than just putting another in fear"; it is "putting that person in some high degree of fear, a state of intense fright or apprehension." *Moore*, 315 N.C. at 745, 340 S.E.2d at 405 (internal quotation marks and citation omitted). In determining the sufficiency of the evidence of intent to terrorize, "the test is not whether subjectively the victim was in fact terrorized, but whether the evidence supports a finding that the defendant's purpose was to terrorize her." *Id.* Nonetheless, the "victim's subjective feelings of fear, while not determinative of the defendant's intent to terrorize, are relevant." *State v. Baldwin*, 141 N.C. App. 596, 604, 540 S.E.2d 815, 821 (2000) (citations omitted) (sufficient evidence that defendant acted with purpose to terrorize victim, who was "petrified" when defendant confined her to her apartment against her will by brandishing a loaded gun, despite her requests to leave). *See also State v. Surrett*, 109 N.C. App.

344, 350, 427 S.E.2d 124, 127 (1993) (sufficient evidence that defendant "intended by his actions and commands to put the victim in a state of intense fright or apprehension" where defendant struggled to hold victim in car against her will despite her screams).

In this case, the evidence shows the following: (a) unbeknownst to Gonzalez, Defendant lay in the back seat of her car holding a knife while he waited for her to get off work; (b) Defendant forced Gonzalez to remain inside and drive the car by applying enough choking force to her neck to create visible red marks and threatening her with a knife; and (c) even after arriving at the gas station where Gonzalez screamed for help and tried to open the door to get out of the car, Defendant attempted to force Gonzalez to stay in the car by hitting the top of her head with enough force to cause her to be lightheaded. Considered in the light most favorable to the State, this evidence was sufficient to support a finding that Defendant confined Gonzalez with the intent to put her in a "high degree of fear, a state of intense fright or apprehension." *Moore*, 315 N.C. at 745, 340 S.E.2d at 405. Moreover, Gonzalez's screams, frantic exit from the car, and escape into the convenience store show her fear during the incident, which is also relevant to support the finding that Defendant intended to terrorize her. *See Baldwin*, 141 N.C. App. at 604, 540 S.E.2d at 821. Accordingly, the State provided substantial evidence of this element of the offense,

and denial of Defendant's motion to dismiss was proper. *See Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455.

## B. Assault with a deadly weapon

Defendant next argues that the trial court erred by denying Defendant's motion to dismiss for insufficient evidence the charge of assault with a deadly weapon on Jackson, because the State failed to present sufficient evidence that Defendant assaulted him.

Misdemeanor assault with a deadly weapon is defined by statute to include assault with use of a deadly weapon. N.C. Gen. Stat. § 14-33(c)(1) (2018). "There is no statutory definition of assault in North Carolina, and the crime of assault is governed by common law rules." *State v. Roberts*, 270 N.C. 655, 658, 155 S.E.2d 303, 305 (1967). Our Supreme Court has defined assault as "an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which show of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm." *Id.* (internal quotation marks and citations omitted). The Court further explained:

> This common law rule places emphasis on the intent or state of mind of the person accused. The decisions of the Court have, in effect, brought forth another rule known as the "show of violence rule," which places the emphasis on the reasonable apprehension of the person assailed. The "show of violence rule" consists of a show of violence

accompanied by reasonable apprehension of immediate bodily harm or injury on the part of the person assailed which causes him to engage in a course of conduct which he would not otherwise have followed. . . . Thus, there are two rules under which a person may be prosecuted for assault in North Carolina.

*Id.* (citation omitted). *See also State v. Floyd*, 369 N.C. 329, 336, 794 S.E.2d 460, 465 (2016) (the show of violence rule is based on a violent act or threat that causes fear in another person, as distinguished from an attempt to cause injury to another person).

On appeal, Defendant argues that the State's evidence does not satisfy either rule for establishing assault, as it does not show that Defendant drove the car toward Jackson or that Defendant's conduct would put a reasonable person in Jackson's position in fear of immediate bodily harm. Defendant supports this argument by highlighting conflicting testimony.

On direct examination as a witness for the State, Jackson provided the following testimony:

> Q. And at what point did you realize that that vehicle was coming towards you?
>
> A. When it -- once the gas was stomped and it started heading towards us.
>
> Q. When you say the gas was stomped, what alerted you to that?
>
> A. You could hear it. High rpm's.
>
> Q. And you mentioned the location where you were over at the pump. Were -- did you have to take any measures to avoid being hit by the vehicle?

A. No, Ma'am, I didn't.

Q. And what about your brother? What were you able to observe?

A. He tried to get out of the way. Obviously, he couldn't. Jumped up, like perfect timing and just caught the hood of the car and landed on it with his knees and kind of just plopped on the front and then rolled right off and jumped behind that pillar right there.

On cross-examination, Jackson testified:

Q. . . . . You got out of the way?

A. Yes, sir.

Finally, on re-direct examination, Jackson testified:

Q. Jackson, you mentioned earlier that when the defendant was driving the car in your direction, you had to hide behind the gas pump?

A. Yes, sir. Or yes, Ma'am. Excuse me.

Q. Why did you even go to hide behind the gas pump?

A. A moving vehicle coming towards me and I don't really like that. Just getting out of the way.

Q. How far away was the vehicle from you when you made the decision to go and hide where the gas pumps were?

A. I don't know. Maybe 10 or 15 feet. I am not sure.

Q. Where the vehicle actually drove, was that in the place you were standing from when you first noticed the vehicle coming towards you?

A. No.

Q. Let me ask that another way. Were you standing, prior to moving behind the gas pump, were you standing in the direction the vehicle was moving?

A. Do you mean like when he started pulling towards the bushes? No.

> Q. But when he started pulling towards you and your brother?
>
> A. Yes. When he started pulling towards -- well, yes, when he started pulling towards us, I was kind of already walking up on that little sidewalk area, so I was already right there by the pump. All I had to do was take two steps and I was behind it.

The State also presented testimony by a police officer who interviewed Jackson. The officer testified that Jackson stated that Defendant "drove directly towards the two brothers attempting to run them over."

When viewed in the light most favorable to the State, the trial testimony provides substantial evidence of assault. First, the testimony supports a conclusion that Defendant committed an "overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury" to Jackson by driving a moving vehicle toward him at a high rate of speed. *Roberts*, 270 N.C. at 658, 155 S.E.2d at 305. Second, the testimony supports a conclusion that Defendant's actions—which included driving the car fast toward Jackson immediately after both had engaged in a violent struggle—put Jackson reasonably in fear of immediate bodily harm and prompted him to get out of the way. *See id.*; *Floyd*, 369 N.C. at 336, 794 S.E.2d at 465 (show of violence rule is based on a violent act or threat that causes fear in another person).

We reject Defendant's contention that any conflicting testimony in the record renders the State's evidence insufficient. "[C]ontradictions and discrepancies do not

warrant dismissal of the case but are for the jury to resolve." *Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455 (citation omitted). Thus, all evidence about whether Jackson was in fear of immediate harm was properly put before the jury. *State v. Allen*, 360 N.C. 297, 305, 626 S.E.2d 271, 279 (2006) (citation omitted) ("It is for the jury to decide issues of fact when conflicting information is elicited by either party.").

Because the State presented sufficient evidence to support the conclusion that Defendant assaulted Jackson, the trial court did not err by denying Defendant's motion to dismiss.

## IV. Conclusion

The State presented sufficient evidence of Defendant's intent to terrorize Gonzalez and that Defendant assaulted Jackson. Accordingly, we discern no error by the trial court in denying Defendant's motion to dismiss for insufficient evidence of these two offenses.

NO ERROR.

Chief Judge McGEE and Judge DIETZ concur.